In the

# United States Court of Appeals
## For the Seventh Circuit

———————————

No. 14-1635

LOUIS A. BIANCHI, *et al.*

*Plaintiffs-Appellants,*

*v.*

THOMAS K. MCQUEEN, *et al.*

*Defendants-Appellees.*

———————————

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:12-cv-00364 — **Robert M. Dow, Jr.**, *Judge.*

———————————

ARGUED APRIL 16, 2015 — DECIDED MARCH 29, 2016

———————————

Before POSNER, EASTERBROOK, and SYKES, *Circuit Judges.*

SYKES, *Circuit Judge.* In 2004 Louis Bianchi was elected to the office of State's Attorney in McHenry County, Illinois, and immediately embarked on a program of reforms. Along the way he acquired a few enemies. In 2006 one of the secretaries in the office resigned and took a treasure trove of sensitive documents with her. Working with a disgruntled Assistant State's Attorney whom Bianchi had demoted, the sec-

retary delivered the documents to the media and to Bianchi's opponent in the next election.

When Bianchi learned of the document theft, he asked a judge to appoint a special prosecutor to investigate. The judge obliged, and the former secretary was charged with several felonies and eventually pleaded guilty to computer tampering. In the meantime, Bianchi's opponent—aided by the secretary and other unnamed political enemies—sought the appointment of *another* special prosecutor, this time to investigate *Bianchi* for politicking on the public's dime (among other alleged malfeasance). Again a judge obliged; a special prosecutor was appointed, a grand jury was convened, and Bianchi and three of his colleagues were indicted on multiple counts of official misconduct. All were acquitted.

Once vindicated, Bianchi and his colleagues filed this suit for damages under 42 U.S.C. § 1983 against Henry Tonigan, the court-appointed special prosecutor; Thomas McQueen, the court-appointed assistant special prosecutor; and Quest Consultants International, Ltd., a firm of private investigators hired by the special prosecutors, and several of its investigators. The plaintiffs claim that the defendants fabricated evidence and withheld exculpatory evidence in violation of their rights under the Due Process Clause and the Fourth Amendment. They also allege a claim for political retaliation in violation of the First Amendment.

Tonigan settled and dropped out of the case. McQueen and the Quest investigators moved to dismiss based on the combined effect of absolute prosecutorial immunity and qualified immunity. The district court granted the motion,

concluding that the two immunities foreclose the federal constitutional claims. That ruling was sound and we affirm.

## I. Background

In 2004 Bianchi was first elected as McHenry County State's Attorney; he has been reelected ever since.[1] The events underlying this litigation took place between 2006 and 2011. This suit was filed in 2012, and the district judge gave the plaintiffs extra pleading opportunities to try to overcome the dual barriers of absolute and qualified immunity. We take the following factual account from the second amended complaint. Because the case comes to us from an order dismissing the complaint for failure to state a claim, *see* FED. R. CIV. P. 12(b)(6), we accept the plaintiffs' allegations as true but remind the reader that these are only allegations, *see Jay E. Hayden Found. v. First Neighbor Bank, N.A.*, 610 F.3d 382, 384 (7th Cir. 2010).

We note for starters—as did the district judge—that the second amended complaint differs in significant respects from the earlier versions, probably because of the intervening settlement with Tonigan. The earlier versions alleged that Tonigan was in cahoots with the other defendants to fabricate evidence used to prosecute the plaintiffs. The current theory, in contrast, is that Tonigan was an unwitting participant in an unconstitutional prosecution. More specifically, the second amended complaint alleges that McQueen

---

[1] Late last year Bianchi announced that he would not run for reelection in 2016. *See* Kevin P. Craver, *McHenry County State's Attorney Lou Bianchi dropping re-election bid*, NW. HERALD (Dec. 7, 2015), http://www.nwherald.com/2015/12/07/mchenry-county-states-attorney-lou-bianchi-dropping-re-election-bid/a9b23i5/.

and the Quest investigators "duped" Tonigan into prosecuting Bianchi and his colleagues by feeding him fabricated witness statements and other false evidence.

We have one more preliminary observation before we proceed. Key factual allegations in the second amended complaint are pleaded with a conspicuous Rule 11 qualifier. To take just one example: "After a reasonable opportunity for further investigation or discovery, *there likely will be evidentiary support* that Defendants McQueen and the Quest Investigators used the false evidence and witness statements that they manufactured during the investigation and concealed exculpatory evidence in order to 'dupe' Tonigan to bring charges … ." (Emphasis added.)

The defendants urged the judge to disregard all such allegations outright. The plaintiffs' attorney objected, explaining that this mode of pleading was necessary under the circumstances and is specifically permitted by Rule 11(b)(3).[2] The judge accepted this explanation and rejected the defendants' invitation to disregard these allegations based on the qualifier alone. We'll do the same.

For simplicity, from now on we'll omit the modifier "second amended" and simply refer to the "complaint."

* * *

Amy Dalby was a secretary in the McHenry County State's Attorney's Office from 2004 to 2006. She resigned in

---

[2] Rule 11(b)(3) provides that by submitting a pleading to the court, counsel certifies that any factual contentions contained in the pleading "have evidentiary support, or if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery."

July 2006, taking some 5,000 sensitive documents with her. She was encouraged in this theft by Kristin Foley, an Assistant State's Attorney whom Bianchi had demoted. In October 2007 Dalby and Foley gave the documents to members of the local media and to Daniel Regna, Bianchi's opponent in the upcoming 2008 Republican primary for State's Attorney.

When the document theft came to light in November 2007, Bianchi petitioned the McHenry County Circuit Court for the appointment of a special prosecutor to investigate. A special prosecutor was duly appointed and grand-jury proceedings followed. In March 2009 Dalby was indicted on six felony counts. In June 2009 she pleaded guilty to computer tampering. Before she did so, however, Regna—Bianchi's political nemesis—petitioned for the appointment of a special prosecutor to investigate *Bianchi* on allegations that he had ordered Dalby do political work on county time. Dalby too filed a petition asking for a special prosecutor to investigate Bianchi, echoing the allegations made by Regna.

In September 2009 Judge Gordon Graham of the McHenry County Circuit Court appointed Tonigan, a former circuit court judge, as a "Special State's Attorney" under the authority of 55 Ill. Comp. Stat. 5/3-9008 and tasked him with investigating the allegations made by Regna and Dalby. Judge Graham also appointed McQueen, a local attorney, to work with Tonigan as an assistant special prosecutor.

Tonigan and McQueen quickly discovered that the statute of limitations had run on Dalby's allegations, so in November 2009 they asked Judge Graham to expand the scope of the investigation. The judge agreed and authorized them to investigate and prosecute "any and all persons rela-

tive to the possible misuse, misappropriation or theft of public funds, public property or public personnel by McHenry County State[']s Attorney Louis Bianchi from 2005 and thereafter."

In December 2009 Tonigan and McQueen retained Quest Consultants to assist in the investigation and asked the court to appoint Quest's investigators as special investigators. Again the court obliged. By April 2010 Judge Graham had convened a grand jury.

As we've noted, the current theory of the case is that it was actually McQueen—not Tonigan—who controlled the investigation. The complaint alleges that McQueen conspired with the Quest investigators "to limit Tonigan's role in and knowledge of" what was actually going on. The plaintiffs accuse McQueen and the investigators of "manufacturing" and "fabricating" evidence against them—largely in the form of false witness statements—both before and after the grand jury was convened. This false evidence was then presented to the grand jury, and in September 2010 the special prosecutors obtained indictments against Bianchi and Joyce Synek, his executive assistant, on 19 counts of official misconduct. Arrest warrants followed. On September 10, 2010, Bianchi and Synek were arrested and immediately released on bond that same day.

We pause here to note a factual concession that will become important later. The complaint alleges that Bianchi and Synek were "held in custody at the McHenry County Jail" following their arrest. But at oral argument the plaintiffs' attorney abandoned that allegation, telling us that Bianchi and Synek in fact were never held in custody; rather, they were immediately released on bond and not detained.

Now back to the narrative. At this point the special prosecutors realized they had a problem: A charge of official misconduct in Illinois requires an underlying crime. So in October McQueen interviewed Peter Austin, the McHenry County Administrator, to find out whether public officials ever had the discretion to use county property for non-county business. The complaint alleges that McQueen and the investigators thereafter "manufactured a false statement of Peter Austin for the purpose of creating the appearance that there was probable cause to charge Bianchi and Synek with conspiracy and official misconduct." McQueen and the investigators then fed this fabricated evidence to Tonigan, who (with McQueen pulling the strings) used it to obtain a superseding indictment against Bianchi and Synek on October 22, 2010.

Meanwhile, shortly after the grand jury issued its first indictment, McQueen returned to Judge Graham for broader authority to investigate other allegations of misconduct in the State's Attorney's Office. On October 1, 2010, the judge signed an order expanding the scope of the investigation. McQueen and the investigators thereafter fabricated still more evidence with which to dupe the credulous Tonigan into pursuing additional charges.

On February 24, 2011, the grand jury indicted Bianchi on three counts of official misconduct for intervening in criminal cases on behalf of his political supporters. The grand jury also issued misconduct charges against Ronald Salgado and Michael McCleary, both investigators in Bianchi's office—Salgado for intervening in a case involving his nephew and McCleary for improperly using a county vehicle. Arrest warrants were issued, and the three men were arrested and im-

mediately released on bond. (Again, the complaint alleges that they were held in custody following their arrest, but counsel told us at oral argument that they were not detained.)

With the entire McHenry County judiciary recused, Judge Joseph McGraw was brought in from Winnebago County to preside over the cases. The complaint alleges that McQueen and the investigators suppressed exculpatory evidence that would have persuaded Tonigan to drop the prosecution. In March and August 2011, the cases were separately tried to the court. Judge McGraw acquitted the defendants of all charges.

This action for damages followed in January 2012. Bianchi, Synek, Salgado, and McCleary sued Tonigan, McQueen, Quest, and five individual Quest investigators,[3] alleging that they committed various federal constitutional torts.

The judge dismissed the first amended complaint based on absolute and qualified immunity but allowed the plaintiffs a second opportunity to replead if they thought they could overcome the obstacles the judge had identified in his dismissal order. As we've noted, Tonigan then settled with the plaintiffs; the latest iteration of the complaint depicts him as an unsuspecting tool of McQueen and the Quest investigators. The plaintiffs allege that the remaining defendants violated their rights under the Due Process Clause, the Fourth Amendment, and the First Amendment. The complaint also includes state-law claims for malicious prosecu-

---

[3] The Quest investigators are Robert Scigalski, Daniel Jerger, James Reilly, Patrick Hanretty, and Richard Stilling.

tion and intentional infliction of emotional distress. All counts contain substantive and conspiracy components.

Ruling on a renewed motion to dismiss, the judge held that the latest version of the complaint suffered from the same defects as the earlier ones and dismissed the federal claims with prejudice. The judge relinquished jurisdiction over the state-law claims, dismissing them without prejudice to refiling in state court. *See* 28 U.S.C. § 1367(c)(3). This appeal followed.

## II. Discussion

The plaintiffs' pursuit of a damages remedy under § 1983 encountered two immediate obstacles: absolute prosecutorial immunity and qualified immunity. Prosecutors are absolutely immune from liability for damages under § 1983 for conduct that is functionally prosecutorial; this immunity is understood to broadly cover all conduct associated with the judicial phase of the criminal process. *See Van de Kamp v. Goldstein*, 555 U.S. 335, 341–43 (2009); *Burns v. Reed*, 500 U.S. 478, 486 (1991); *Imbler v. Pachtman*, 424 U.S. 409, 430–31 (1976). Police, law-enforcement investigators, and prosecutors acting in an investigative capacity may claim only qualified immunity, which covers "conduct that 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Whitlock v. Brueggemann*, 682 F.3d 567, 580 (7th Cir. 2012) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

This appeal turns entirely on the applicability of these two forms of immunity. We review the district court's decision de novo. *Chasensky v. Walker*, 740 F.3d 1088, 1093 (7th Cir. 2014); *Fields v. Wharrie*, 672 F.3d 505, 510 (7th Cir. 2012).

**A. Absolute Immunity**

McQueen is protected by absolute immunity to the extent that the claims against him are premised on his conduct as a prosecutor. The district judge ruled that absolute immunity protects McQueen in part. McQueen argues that he is protected in full. The plaintiffs say absolute immunity doesn't apply at all because McQueen wasn't *really* acting as a prosecutor but instead was a private lawyer who was merely *assisting* a court-appointed special prosecutor. We think the district court got it right.

**1. *Was McQueen a Prosecutor?***

The plaintiffs argue that although McQueen "held himself out" as a criminal prosecutor, he wasn't *actually* a prosecutor under the relevant state law. In their view the controlling statute—55 ILL. COMP. STAT. 5/3-9008—permits only *one* special prosecutor, and Judge Graham named Tonigan.

This argument is hard to take seriously. On its face the statute contains no numeric limitation. Indeed it refers to "[*a*]*ny* attorney appointed for any reason under this Section," who by virtue of the court's appointment shall "possess all the powers and discharge all the duties of a regularly elected State's attorney." *Id.* § 5/3-9008(b) (emphasis added).

Judge Graham's September 18, 2009 appointment order cited this statutory authority and appointed "Attorney Thomas K. McQueen" to "assist the specially appointed prosecutor, Henry C. Tonigan, III, as directed by him on all matters relative to this case." If there's any ambiguity here (and we don't see any), Judge Graham's October 1, 2010 order expanding the investigation specifically refers to *both* Tonigan *and* McQueen as "Special State's Attorneys."

If more were needed, we note that the Illinois Appellate Court didn't see any relevant distinction between Tonigan and McQueen; it recognized both men as special prosecutors. Ruling on a question about their compensation, the appellate court wrote as follows: "Tonigan was appointed as a special prosecutor, and McQueen was appointed as an assistant to the special prosecutor. Throughout this order, we refer to them jointly as Special Prosecutors." *In re Appointment of a Special Prosecutor*, Nos. 2-12-0318, *et al.*, 2012 WL 6969007, at *1 n.1 (Ill. App. Ct. Sept. 25, 2012). The court went on to affirm the circuit court's decision to pay McQueen and Tonigan the same hourly rate for their work.

In the teeth of the statutory language and this evidence, the plaintiffs insist that the position of "special assistant state's attorney" simply "does not exist." For support they cite *People v. Woodall*, 777 N.E.2d 1014, 1019 (Ill. App. Ct. 2002), but that case isn't on point. *Woodall* concerned the status of special state's attorneys who were deputized by *other prosecutors*, not appointed by the court under section 9008. *See id.* at 1017 ("None of the three Agency attorneys were appointed by court order to perform as special prosecutors."). That case has no bearing on whether section 9008 permits the court to appoint more than one special state's attorney. It plainly does. And Judge Graham plainly appointed two special prosecutors, Tonigan and McQueen.

The plaintiffs also argue that McQueen wasn't really a prosecutor because his appointment was procured by fraud and is therefore void. This argument is directed at the October 1, 2010 order, which the plaintiffs claim "was obtained solely through the perjured petition of McQueen in which he intentionally presented Judge Graham with evidence that he

fabricated in order to fraudulently obtain the authority to investigate and prosecute Bianchi and Salgado."

But Judge Graham appointed McQueen by order dated September 18, 2009. The October 2010 order—the one the plaintiffs say was procured by fraud—merely expanded the scope of the investigation.

### 2. *The Scope of Prosecutorial Immunity*

So McQueen was a prosecutor. The extent to which he is protected by absolute prosecutorial immunity depends on the type of work he performed and the factual premises of the plaintiffs' claims. A prosecutor only enjoys absolute immunity insofar as he is "act[ing] within the scope of his prosecutorial duties." *Imbler v. Pachtman*, 424 U.S. 409, 420 (1976). The inquiry requires a "functional approach." *Rehberg v. Paulk*, 132 S. Ct. 1497, 1503 (2012). That is, we "look[] to the nature of the function performed." *Buckley v. Fitzsimmons*, 509 U.S. 259, 269 (1993) (quotation marks omitted). But absolute prosecutorial immunity is not restricted to what goes on in the courtroom: "[T]he duties of the prosecutor in his role as advocate for the State involve actions preliminary to the initiation of a prosecution and actions apart from the courtroom." *Imbler*, 424 U.S. at 431 n.33.

More particularly, the immunity encompasses quintessentially prosecutorial functions like "an out-of-court 'effort to control the presentation of [a] witness' testimony,'" *Buckley*, 509 U.S. at 272–73 (quoting *Imbler*, 424 U.S. at 430 n.32), and "acts undertaken by a prosecutor in preparing for the initiation of judicial proceedings or for trial," *id.* at 273. These include "the professional evaluation of the evidence assembled by the police and appropriate preparation for its presentation at trial or *before a grand jury after a decision to seek*

*indictment has been made.*" *Id.* (emphasis added).

At the other end of the spectrum, a prosecutor is not absolutely immune for acts that "go beyond the strictly prosecutorial to include investigation." *Fields v. Wharrie* ("*Fields II*"), 740 F.3d 1107, 1111 (7th Cir. 2014) (citing *Buckley*, 509 U.S. at 275–76)). A prosecutor acting in an investigative capacity may claim only the same qualified immunity that protects police officers and other law-enforcement investigators. *Id.*

With this background in mind, it's clear that absolute immunity knocks out a large part of the case against McQueen—most notably the claims premised on allegations that McQueen presented false statements to the grand jury and at trial. Still, some of the allegations cover conduct that stretches back to the investigative period before McQueen was engaged in what could reasonably be called prosecutorial advocacy. The complaint contains allegations of evidence fabrication and other chicanery months before the grand jury was empaneled.

The district judge observed that many of these allegations are vague and alleged only very generally and "as to a large window of time (October 2009–August 2010)." They are indeed vague (e.g., "McQueen personally interviewed individuals and also directed [Quest] to conduct certain interviews for the purpose of manufacturing and fabricating evidence."). They're also general (e.g., "McQueen and [Quest] manufactured evidence and fabricated inculpatory witness statements against Bianchi and other [State's Attorney's Office] employees."). But these weaknesses do not affect the scope of McQueen's absolute immunity. We agree with the judge that McQueen is not absolutely immune for

his investigative conduct in the months before the grand jury was convened.

But he—and the Quest defendants—remain protected by qualified immunity.

## B. Qualified Immunity

Qualified-immunity doctrine holds that "government officials are not subject to damages liability for the performance of their discretionary functions when 'their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Buckley*, 509 U.S. at 268 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "[T]wo central questions must be addressed in the course of determining whether qualified immunity is available: whether the plaintiff has alleged a deprivation of a constitutional right at all, and whether the right at issue was clearly established at the time and under the circumstances presented." *Whitlock*, 682 F.3d at 580.

The complaint alleges claims for violation of (1) due process (evidence fabrication and breach of the *Brady* duty to disclose exculpatory evidence); (2) the First Amendment (for political retaliation); and (3) the Fourth Amendment (for false arrest). Qualified immunity bars them all.

### 1. *Due Process/Evidence Fabrication*

Allegations of evidence fabrication may state a colorable due-process claim in the wake of our decisions in *Whitlock* and *Fields II*. *See id.* at 580–82 (holding that a prosecutor's fabrication of evidence while acting as an investigator is not covered by qualified immunity); *Fields II*, 740 F.3d at 1114–15. But an act of evidence fabrication doesn't implicate due-process rights *unless* the fabricated evidence "is later used to

deprive the [criminal] defendant of her liberty in some way."
*Whitlock*, 682 F.3d at 580. A deprivation of liberty is a necessary element of a due-process claim premised on allegations of evidence fabrication. "[I]f an officer (or investigating prosecutor) fabricates evidence and puts that fabricated evidence in a drawer, making no further use of it, then the officer has not violated due process; the action did not cause an infringement of anyone's liberty interest." *Id*. at 582 (citing *Buckley v. Fitzsimmons*, 20 F.3d 789, 795 (7th Cir. 1994)).

Bianchi and his colleagues suffered no deprivation of liberty; they were acquitted at trial. That brings this case squarely within the holding of *Saunders-El v. Rohde*, 778 F.3d 556 (7th Cir. 2015*)*. Our decision in *Saunders-El* reiterated that "[n]ot every act of evidence fabrication offends one's due process rights." *Id.* at 560. To explain, we pointed to the recent case of *Alexander v. McKinney*, 692 F.3d 553 (7th Cir. 2012). *Alexander* involved an evidence-fabrication claim by a plaintiff who was arrested, immediately released on bond, and found not guilty at trial. *Id.* at 555–57. Following his acquittal, he sued the prosecutor and investigators, alleging that they conspired "to manufacture false evidence and bring trumped-up charges" in violation of his right to due process. *Id.* at 554. We held in *Alexander* that the plaintiff's acquittal foreclosed any due-process claim. *See id.* at 557. Indeed, we said "[i]t would be anomalous to hold that attending a trial deprives a criminal defendant of liberty without due process of law, when the purpose of trial is to *effectuate* due process." *Id.* at 557 n.2.

The same result followed in *Saunders-El*. We held that because "Saunders-El [was] released on bond following his arrest and acquitted at trial, [his case] falls squarely within our

holding in *Alexander*, and … [he] cannot make out an evidence fabrication-based due process violation." 778 F.3d at 561. We explained that "due process is not implicated when, as here, the defendant is released on bond following his arrest and acquitted at trial." *Id.* at 558.

*Saunders-El* and *Alexander* foreclose the evidence-fabrication claim alleged in this case. Because the plaintiffs suffered no liberty deprivation, they suffered no due-process violation. When pressed on this point at oral argument, the plaintiffs' attorney conceded the controlling force of *Saunders-El* and grudgingly accepted the impossibility of prevailing on this claim. So even if acts of evidence fabrication could be proved, qualified immunity applies.

### 2. *Due Process/Brady*

The complaint states a separate due-process claim based on alleged violations of the *Brady* duty to disclose material exculpatory evidence. This claim too runs into difficulty for a similar reason: A violation of *Brady* requires a showing of prejudice, which can't be made here because the plaintiffs were acquitted.

As the Supreme Court has explained,

> [T]he term "*Brady* violation" is sometimes used to refer to any breach of the broad obligation to disclose exculpatory evidence—that is, to any suppression of so-called "*Brady* material"—although, strictly speaking, there is never a real "*Brady* violation" unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict.

*Stricker v. Greene*, 527 U.S. 263, 281 (1999). The Court succinctly elaborated the point, saying "[t]here are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Id.* at 281–82.

Accordingly, we've explained that it's "doubtful … that an acquitted defendant can ever establish the requisite prejudice for a *Brady* violation." *Carvajal v. Dominguez*, 542 F.3d 561, 570 (7th Cir. 2008). The Sixth, Tenth, and Eleventh Circuits have definitively held that an acquittal extinguishes a *Brady* claim.[4] So even assuming the truth of the allegations about evidence suppression, no *Brady* violation occurred because the plaintiffs suffered no prejudice. Qualified immunity bars this claim too. (Indeed, absolute immunity bars the *Brady* claim against McQueen.)

### 3. *First Amendment Retaliation*

Bianchi alleges that McQueen and the Quest investigators pursued this prosecution in retaliation for his decision to seek and hold public office, and this politically motivated retaliation violated his First Amendment rights. Synek joins him in this claim. But they haven't pleaded plausible allegations that McQueen and the investigators harbored retaliatory animus or that a causal connection between the retaliatory motive and the claimed injury exists.

To succeed on a political-retaliation claim, a "plaintiff

---

[4] *See Morgan v. Gertz*, 166 F.3d 1307, 1310 (10th Cir. 1999); *Flores v. Satz*, 137 F.3d 1275, 1278 (11th Cir. 1998); *McCune v. City of Grand Rapids*, 842 F.2d 903, 907 (6th Cir. 1988).

must show a causal connection between a defendant's retaliatory animus and subsequent injury in any sort of retaliation action." *Hartman v. Moore*, 547 U.S. 250, 259 (2006). Even if retaliatory animus can be shown, the retaliation must be the cause-in-fact of the claimed injury. *See Thayer v. Chiczewski*, 705 F.3d 237, 252 (7th Cir. 2012) ("If retaliation is not the but-for cause of the arrest, 'the claim fails for lack of causal connection between unconstitutional motive and resulting harm, despite proof of some retaliatory animus in the official's mind.'" (quoting *Hartman*, 547 U.S. at 260)).

The complaint does not come close to plausibly alleging that McQueen or the investigators harbored retaliatory animus against Bianchi for seeking and holding office or that this animus, if it existed, was the cause-in-fact of the alleged false indictment. At most the complaint alleges that McQueen and the investigators interviewed Bianchi's political enemies during the course of the investigation. That's not enough to support a reasonable inference that they harbored retaliatory animus or were in cahoots with those who did. This claim too was properly dismissed.

### 4. *Fourth Amendment/False Arrest*

The final claim is one for false arrest in violation of the Fourth Amendment. The complaint alleges that McQueen and the investigators fabricated evidence during the investigation, which in turn was used to indict and arrest the plaintiffs without probable cause.

The problem with this claim is that it's not actually one for false arrest, at least not on the facts alleged here. As the district judge correctly noted, false arrest "is detention *without* legal process," and Bianchi and his colleagues were arrested on warrants that were issued *after* the grand jury in-

dicted. That is, they were arrested *after* and *as a consequence of* formal legal process. What the complaint calls a claim for false arrest is really one for malicious prosecution, which does not implicate any interests protected by the Fourth Amendment. (Or at least it does not under existing law; we'll have more to say about this in a moment.)

The Supreme Court's decision in *Wallace v. Kato* is instructive on this point. *Wallace* addressed a statute-of-limitations question: What is the accrual rule for a Fourth Amendment claim for arrest without probable cause? 549 U.S. 384, 386–87 (2007). The Court held that the limitations period "begins to run at the time the claimant becomes detained pursuant to legal process." *Id.* at 397. Along the way to this holding the Court had a lot to say about how to classify and analyze the different constitutional claims that might arise from a wrongful arrest and prosecution.

By way of background, the plaintiff in *Wallace* was arrested without a warrant and without probable cause (or so he claimed), and was detained and remained in jail pending trial on a murder charge. *Id.* at 386–89. He was convicted of murder and sentenced to 26 years in prison. *Id.* at 386. When his conviction was later overturned, he sued the arresting officers for false arrest in violation of the Fourth Amendment. *See id.* at 387. The question before the Court was whether the cause of action accrued "at the time of his arrest … [or] when his conviction was later set aside." *Id.* If the former, the suit was untimely; if the latter, it could proceed. *See id.* at 387–88.

The Court began by explaining that a Fourth Amendment false-arrest claim—that is, a claim arising from a warrantless arrest without probable cause—is most closely anal-

ogous to a common-law claim for false imprisonment. *Id*. at 389. And "[t]he sort of unlawful detention remediable by the tort of false imprisonment is detention *without legal process*," which "ends once the victim becomes held *pursuant to such* [*legal*] *process*—when, for example, he is bound over by a magistrate or arraigned on charges." *Id*.

The Court continued: "Thereafter [i.e., after the initiation of formal legal process], unlawful detention forms part of the damages for the 'entirely distinct' tort of malicious prosecution, which remedies detention accompanied, not by absence of legal process, but by *wrongful institution* of legal process." *Id*. at 390 (quoting W. PAGE KEETON, ET AL., PROSSER AND KEETON ON LAW OF TORTS § 119, at 885–86 (5th ed. 1984)). It follows, the Court said, that

> [i]f there is a false arrest claim, damages for that claim cover the time of detention up until issuance of process or arraignment, but not more. From that point on, any damages recoverable must be based on a malicious prosecution claim and on the wrongful use of judicial process rather than detention itself.

*Id*. (quoting KEETON, *supra*, § 119, at 888).

After *Wallace* we have applied similar boundaries: "Typically, the scope of a Fourth Amendment claim is limited up to the point of arraignment, at which point the prosecution is underway." *Bielanski v. County of Kane*, 550 F.3d 632, 638 (7th Cir. 2008).

Applying this reasoning here, it's clear that the false-arrest claim is really one for abuse of the judicial process (that is, malicious prosecution). The complaint alleges that

McQueen and the investigators fabricated some of the evidence that was presented to the grand jury to obtain indictments against the plaintiffs, and the indictments in turn led to the issuance of arrest warrants. Bianchi and his colleagues were thus arrested *pursuant to* formal legal process (and then were immediately released on bond). As a factual and legal matter, the claim is for malicious prosecution, not false arrest.[5]

---

[5] The plaintiffs cite *Juriss v. McGowan*, 957 F.2d 345 (7th Cir. 1992), as support for their Fourth Amendment claim. *Juriss* involved a false-arrest claim against a police officer who was alleged to have lied to a grand jury to obtain an indictment against the plaintiff for harboring a fugitive. *Id.* at 346–48. The grand jury indicted the plaintiff, an arrest warrant followed, and the lying officer arrested her. *Id.* at 347–48. Two months later the charge was dropped. *Id.* at 348. The plaintiff sued the officer for false arrest in violation of the Fourth Amendment. *Id.* at 346. Relying on *Malley v. Briggs*, 475 U.S. 335, 345 (1986), we held that qualified immunity did not apply because an officer who engages in deceit to persuade a judicial officer to issue a warrant is not entitled to rely on either the facial validity of the warrant or the *Leon* good-faith exception. *Id.* at 350–51.

We see two problems with extending *Juriss* to this case. First, *Juriss* involved an actual false arrest: A police officer fraudulently obtained a warrant and then arrested the plaintiff pursuant to that warrant. The claim in this case is strictly for abuse of the *legal process*; the complaint does not allege that McQueen or the Quest investigators effectuated the arrests of Bianchi and his colleagues. The second problem is that *Juriss* predates *Wallace*, which more clearly demarcated the lines between the cognizable constitutional torts in cases alleging wrongful arrest and prosecution. As we've already explained, the arrests at issue in this case came *after* and *as a consequence of* the formal initiation of criminal proceedings by indictment. *Wallace* teaches that once formal criminal proceedings have begun, we're in the domain of malicious prosecution, not false arrest. And as a factual matter, the gravamen of the allegations against McQueen and the investigators is abuse of the formal legal process.

Importantly, the Court in *Wallace* specifically declined to address whether a malicious-prosecution claim is *ever* cognizable as a Fourth Amendment violation remediable under § 1983. 549 U.S. at 390 n.2. The plaintiff in *Wallace* had expressly abandoned that issue, which was left unresolved in the Court's split decision in *Albright v. Oliver*, 510 U.S. 266, 270–71 (1994) (plurality opinion). 549 U.S. at 390 n.2; *see generally Albright*, 510 U.S. at 276–81 (Ginsburg, J., concurring). Although some circuits have recognized such a claim, *see Hernandez-Cuevas v. Taylor*, 723 F.3d 91, 99 (1st Cir. 2013) (collecting cases), this circuit has not, *see, e.g., Welton v. Anderson*, 770 F.3d 670, 673–75 (7th Cir. 2014); *Bielanski*, 550 F.3d at 638; *Newsome v. McCabe*, 256 F.3d 747, 750–52 (7th Cir. 2001). With the law this unsettled, qualified immunity applies.[6]

Finally, *even if* this claim were cognizable as a Fourth Amendment violation, McQueen and the investigators would *still* be entitled to qualified immunity. Because the plaintiffs were immediately released on bond and were neither seized nor detained, they suffered no Fourth Amendment injury.

So any way you slice it, the district judge was right to apply the qualified-immunity bar. The Fourth Amendment

---

[6] The Supreme Court has recently granted certiorari to address whether a claim for malicious prosecution is cognizable under the Fourth Amendment where the plaintiff alleges that he was held in pretrial detention without probable cause. *See Manuel v. City of Joliet*, 590 F. App'x 641 (7th Cir. 2015), *cert. granted* 136 S. Ct. 890 (Jan. 15, 2016) (No. 14-9496). *Manuel* will be heard next term. The Court's decision will not affect this case; here the plaintiffs were not held in pretrial detention.

claim was properly dismissed.[7]

AFFIRMED.

---

[7] With the federal claims gone, it was entirely appropriate for the judge to relinquish jurisdiction over the state-law claims and dismiss them without prejudice. *See Sharp Elec. Corp. v. Metro. Life Ins. Co.*, 578 F.3d 505, 514 (7th Cir. 2009) ("Normally, when all federal claims are dismissed before trial, the district court should relinquish jurisdiction over pendent state-law claims … .").