In the

# United States Court of Appeals

## For the Seventh Circuit

———————————

No. 23-2277

RANDALL N. MARTIN,

*Plaintiff-Appellant,*

*v.*

ROBERT A. GOLDSMITH, *et al.,*

*Defendants-Appellees.*

———————————

Appeal from the United States District Court for the
Northern District of Indiana, Hammond Division.
No. 2:22-CV-226 — **Philip P. Simon**, *Judge.*

———————————

ARGUED FEBRUARY 23, 2024 — DECIDED DECEMBER 31, 2025

———————————

Before SCUDDER, JACKSON-AKIWUMI, and PRYOR, *Circuit Judges.*

PRYOR, *Circuit Judge.* Randall Martin, a former lieutenant with the Tippecanoe County Sheriff's Office, faced allegations of excessive force. He agreed to resign from his post and waive his hearing before the merit board. In return, the sheriff—Robert Goldsmith—promised to give Martin a neutral reference letter and withdraw pending disciplinary charges.

In the days that followed Sheriff Goldsmith's promise, however, Sheriff Goldsmith and two county prosecutors—Patrick Harrington and Jason Biss—broadly shared the excessive-force allegations with would-be employers and the legal community in Tippecanoe County. These disclosures essentially rendered Martin unemployable as a police officer. And, according to Martin, that was the whole plan: Harrington, Biss, and Goldsmith conspired to induce Martin to resign his position—and waive his due process rights—with every intention of disseminating the excessive-force allegations against him.

Martin sued, alleging that Goldsmith, Harrington, and Biss coerced him into resigning in violation of Martin's rights under state law and his procedural due process rights under the Fourteenth Amendment of the United States Constitution. The district court dismissed Martin's claims. It found absolute and qualified immunity protected the prosecutors. The court also determined that the sheriff could not be liable for violations of Martin's due process rights as Martin had voluntarily given them up by resigning.

For the reasons we discuss below, we reverse in part, affirm in part, and remand for further proceedings.

## I.   BACKGROUND

The following facts come from Martin's complaint. At this stage in the case, we accept Martin's allegations as true and draw all plausible inferences in his favor. *Martin v. Haling*, 94 F.4th 667, 671 (7th Cir. 2024).

### A. Factual History

The events giving rise to this lawsuit start in 2018, when Robert Goldsmith was elected as the Sheriff of Tippecanoe

County. Several deputies within the Sheriff's Office supported Goldsmith's candidacy. Lieutenant Randall Martin, however, was not one of those officers. In fact, Martin reported his colleagues for unlawfully campaigning for Goldsmith while in uniform. Martin maintained that his colleagues' campaigning violated both the department code and state law. In November of that year, Goldsmith was elected sheriff, and he took office in January 2019.

In late 2020, Martin allegedly used excessive force while conducting arrests of two people. Although neither of the arrested individuals complained about Martin, Sheriff Goldsmith initiated an internal affairs investigation and suspended Martin pending its outcome. Martin invoked his statutory right to a public hearing on the charges before the Tippecanoe County Sheriff's Merit Board, *see* IND. CODE § 36-8-10-11(a), and was issued hearing dates of April 29–30, 2021.

Martin alleges that in the lead-up to the hearing, Sheriff Goldsmith took steps to ensure that the investigation would be biased and the hearing unfair. As for the preliminary investigation, Sheriff Goldsmith replaced the administrative personnel that ran internal affairs with new officers, one of whom the sheriff selected for his political loyalty. Also, one of the officers Martin had filed a complaint against was assigned to conduct the investigation and thus had a motive to seek retribution. As for the merit board, Sheriff Goldsmith allegedly manipulated its composition by replacing members who traditionally had been favorable to Martin with the sheriff's own "hand-picked" choices.

The looming merit board hearing was not Martin's only concern. Sheriff Goldsmith had started a campaign against Martin by issuing "embarrassing and humiliating" press

releases to local media outlets. Sheriff Goldsmith also collaborated with two county prosecutors—Patrick Harrington and Jason Biss—to refer the excessive force issue to a special prosecutor for criminal prosecution.

Facing biased investigators, a loaded merit board, poor publicity, and the threat of criminal charges, Martin offered to resign from his position. Through counsel, Martin approached Sheriff Goldsmith, offering to leave the force on the condition that the departmental excessive force allegations be withdrawn. Sheriff Goldsmith accepted the offer. The "Agreement to Resolve Employment Status" that both parties signed on April 28, 2021, formalized that the pending charges before the merit board would be withdrawn. It also stated that Sheriff Goldsmith would provide a "neutral reference" to Martin's prospective employers and note only that Martin resigned "for personal reasons." Per the agreement, Martin resigned on May 3, 2021.

While he was employed as a lieutenant in the Tippecanoe County Sheriff's Office, Martin also worked part-time as a marshal with the Town of Dayton, Indiana, and he believed that resigning under the terms of the Agreement would allow him to transition into a full-time job as a Deputy Marshal with the Town of Dayton.

Things did not go as planned. On the same day that Martin's resignation became effective, county prosecutors Harrington and Biss shared the details of the investigation into Martin through multiple outlets. Martin claims this action violated the Agreement with Sheriff Goldsmith. He further alleges that it was part of a planned scheme concocted by the prosecutors and Sheriff Goldsmith to convince Martin to give up his right to a hearing.

The prosecutors shared the details of the investigation into Martin through so-called *Brady*/*Giglio* disclosures. These disclosures are named after two Supreme Court cases—*Brady v. Maryland*, 373 U.S. 83 (1963), and *Giglio v. United States*, 405 U.S. 150 (1972)—which obligate prosecutors to disclose exculpatory and impeachment evidence with the defense in criminal proceedings.

The prosecutors' *Brady*/*Giglio* disclosures contained various allegations. They noted, for example, that Martin unnecessarily tased and pepper sprayed two individuals in late 2020. The disclosures also stated Martin later completed a report of the incident that was inconsistent with his bodycam footage. Martin denies these allegations, alleges that they have never been proven, and claims that the prosecutor's office never even spoke to him about them. Regardless, the prosecutors shared these disclosures in three ways.

First, the prosecutors disseminated the unsigned *Brady*/*Giglio* disclosure to members of the Tippecanoe County Bar Association on May 3, 2021, the day Martin's resignation became effective. The disclosure to the Bar Association contained the information about Martin's use of force, but it appeared to be a template. The disclosure had blanks for the name of the prosecutor, the name of the defendant, and the cause number.

Second, that same day, the prosecutors emailed the disclosure to the Town of Dayton, Martin's part-time employer and potential full-time employer. In the email, Biss warned Martin's supervising officer that prosecutors would face difficulty in bringing claims against suspects arrested by Martin. Biss maintained that Martin's testimony as a key witness would be "unusable—proving disastrous to our success on a conviction." Martin contends that because of that email, he was

suspended from his part-time position with the Town of Dayton and never received an offer for a full-time job.

Third, more than a week later, on May 11, 2021, the prosecutors filed *Brady/Giglio* disclosures in dozens of cases in which Martin was an arresting officer. Sometime later, Martin was rejected from consideration as a law enforcement officer for the Town of Flora, Indiana, an out-of-county municipality, despite previously being proactively recruited by the town. Martin believes this was, at least in part, because Sheriff Goldsmith, in concert with the prosecutors, provided the Town of Flora with "false, misleading[,] and defamatory information" about Martin during his application process. Now, Martin maintains he cannot find comparable gainful employment, either as a law enforcement officer or otherwise.

### B. Procedural History

In August 2022, Martin filed a nine-count complaint against Sheriff Goldsmith and the two prosecutors, Harrington and Biss. Eight of the nine counts arose under Indiana law, including claims for breach of contract and defamation. The remaining claim, brought under 42 U.S.C. § 1983, alleged a conspiracy to pressure Martin into resigning from his job and foreclose his chance to find future employment, all without due process, in violation of the Fourteenth Amendment to the United States Constitution.

The district court later granted the defendant's motion to dismiss.[1] The court determined that the prosecutors were entitled to a combination of absolute and qualified immunity.

---

[1] *See generally Martin v. Goldsmith*, No. 2:22-CV-226, 2023 WL 3737048 (N.D. Ind. May 30, 2023).

The district court found that Harrington and Biss were protected by absolute immunity for their disclosures of Martin's alleged conduct to the members of the Tippecanoe County Bar and in certain criminal cases. The district court then decided that this immunity likely extended to the prosecutors' disclosures to the towns of Dayton and Flora, but that even if they did not, the actions were covered by qualified immunity because Martin did not have a clearly established right to prevent the disclosures.

As for the claim against Sheriff Goldsmith, the district court concluded it was without merit. The court determined that because Martin had voluntarily chose to resign, he waived any due process protections afforded to him. With the sole federal claim dismissed, the court relinquished supplemental jurisdiction over Martin's state-law claims and dismissed them without prejudice.

This appeal followed, with the National Fraternal Order of Police filing an *amicus* brief supporting Martin.

## II.  ANALYSIS

We review a district court's dismissal of a complaint on a motion to dismiss de novo. *Watkins v. Mohan*, 144 F.4th 926, 933 (7th Cir. 2025). To survive a motion to dismiss, the complaint must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

We review a district court's conclusions that defendants have absolute or qualified immunity de novo. *See Fields v.*

*Wharrie*, 672 F.3d 505, 510 (7th Cir. 2012); *Fosnight v. Jones*, 41 F.4th 916, 922 (7th Cir. 2022).

Martin sued Sheriff Goldsmith and prosecutors Harrington and Biss under 42 U.S.C. § 1983. This statute lets people hold state and local officials accountable for violating the Constitution. *See id.* While nothing in the text of § 1983 provides for any immunities, *Imbler v. Pachtman*, 424 U.S. 409, 417–18, 417 n.10 (1976), the Supreme Court has long recognized that government officials "are entitled to some form of immunity from suits for damages," *Harlow v. Fitzgerald*, 457 U.S. 800, 806 (1982). These immunities have been read into § 1983 because we read the statute "in harmony with general principles of tort immunities and defenses." *Imbler*, 424 U.S. at 418.

Most executive officials—including police officers—have a qualified immunity from suit. *Harlow*, 457 U.S. at 807; *United States v. Stanley*, 483 U.S. 669, 694 n.12 (1987) (Brennan, J., concurring in part and dissenting in part). This protects them from civil damages unless they violated a "clearly established" right. *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow*, 457 U.S. at 818). We presume that qualified immunity "is sufficient to protect government officials in the exercise of their duties." *Burns v. Reed*, 500 U.S. 478, 486–87 (1991).

But other government officials—legislators, judges, prosecutors, and similar officials—sometimes carry a stronger shield: an absolute immunity from liability. *Harlow*, 457 U.S. at 807. To determine whether this shield is available to the official, we "appl[y] a 'functional approach.'" *Jones v. Cummings*, 998 F.3d 782, 787 (7th Cir. 2021) (quoting *Buckley v. Fitzsimmons*, 509 U.S. 259, 269 (1993)). This approach "looks to

'the nature of the function performed, [and] not [to] the identity of the actor who performed it.'" *Buckley*, 509 U.S. at 269 (quoting *Forrester v. White*, 484 U.S. 219, 229 (1988)). By way of example, a prosecutor does not get absolute immunity from liability for damages under § 1983 for everything he does. Instead, he gets it only when conducting "actions" in his role as an "advocate[]." *Rehberg v. Paulk*, 566 U.S. 356, 363 (2012). The Supreme Court has explained this is necessary to ensure that this historically important governmental function can be performed "with independence and without fear of consequences." *Id.* (internal quotation marks and citation omitted).

Absolute immunity, however, is "strong medicine." *Brunson v. Murray*, 843 F.3d 698, 710 (7th Cir. 2016). In some cases, it may "leave unredressed the wrongs done by dishonest officers." *Imbler*, 424 U.S. at 428 (quoting *Gregoire v. Biddle*, 177 F.2d 579, 581 (2d Cir. 1949) (L. Hand, J.)). Given this reality, courts must be "quite sparing" in recognizing absolute immunity. *Burns*, 500 U.S. at 487 (quoting *Forrester*, 484 U.S. at 224). When a government official seeks to convince us that absolute immunity is appropriate, he "bears the burden of showing that such immunity is justified for the function in question." *Id.* at 486; *see also Buckley*, 509 U.S. at 268. And the contours of the immunity must be drawn precisely, as it cannot extend "further than its justification would warrant." *Burns*, 500 U.S. at 487 (citation omitted).

All of the defendants in this case—Sheriff Goldsmith and prosecutors Harrington and Biss—claim that they are immune from liability. We start by evaluating whether and to what extent the prosecutors are entitled to the heightened protection of absolute immunity. Because we conclude that some of the functions the prosecutors were alleged to perform

are not protected by absolute immunity, we then decide whether all defendants are entitled to qualified immunity.

### A. Absolute Immunity for the Prosecutors

Martin alleges the prosecutors shared *Brady*/*Giglio* disclosures in ways that violated his constitutional rights. Harrington and Biss claim absolute immunity for these actions.

### 1. *Absolute Immunity for Functionally Prosecutorial Conduct*

Prosecutors are absolutely immune from liability for "conduct that is functionally prosecutorial; this immunity is understood to broadly cover all conduct associated with the judicial phase of the criminal process." *Bianchi v. McQueen*, 818 F.3d 309, 316 (7th Cir. 2016); *see Van de Kamp v. Goldstein*, 555 U.S. 335, 341–43 (2009); *Burns*, 500 U.S. at 486; *Imbler*, 424 U.S. at 430. Prosecutors are therefore absolutely immune from liability for filing a criminal charge, *Foreman v. Wadsworth*, 844 F.3d 620, 624 (7th Cir. 2016), making an "incorrect legal argument to [a] state trial court," *Sides v. City of Champaign*, 496 F.3d 820, 827 (7th Cir. 2007), or for presenting allegedly false evidence to a grand jury, *Katz-Crank v. Haskett*, 843 F.3d 641, 647 (7th Cir. 2016).

On the other hand, prosecutors are *not* entitled to absolute immunity when serving as an investigator or an administrator. *Lewis v. Mills*, 677 F.3d 324, 330 (7th Cir. 2012). This means that prosecutors do not have absolute immunity for providing legal advice to the police, *Burns*, 500 U.S. at 495–96, for firing an employee, *Swetlik v. Crawford*, 738 F.3d 818, 824–25 (7th Cir. 2013), or for giving a press conference, *Buckley*, 509 U.S. at 276–78.

The distinction between these two categories aims to free only "the *judicial process* from the harassment and

intimidation associated with litigation." *Burns*, 500 U.S. at 494 (emphasis in original). So, the absolute immunity "analysis hinges on whether the prosecutor is, at the time, acting as an officer of the court, as well as on his action's relatedness to the judicial phase of the criminal process." *Fields*, 672 F.3d at 510 (citing *Imbler*, 424 U.S. at 430, 431 n.33). This analysis is admittedly not always clear-cut. *See Imbler*, 424 U.S. at 431 n.33 (noting that "[d]rawing a proper line between" administrative and prosecutorial functions "may present difficult questions").

### 2. *Absolute Immunity in the* Brady *or* Giglio *Context*

For more than 50 years, prosecutors have been required to disclose material, exculpatory evidence and impeachment evidence to the defense in criminal cases. *Roldan v. Stroud*, 52 F.4th 335, 338–39 (7th Cir. 2022). This obligation stems from two seminal Supreme Court cases, *Brady v. Maryland*, 373 U.S. 83, 87 (1963), and *Giglio v. United States*, 405 U.S. 150, 153 (1972).[2]

We have held that a prosecutor is absolutely immune for "his actions and decisions pertaining to his fulfillment of *Brady* and *Giglio*" in criminal cases. *Fields*, 672 F.3d at 513–14. This is because, when fulfilling his *Brady* or *Giglio* obligations, "the prosecutor acts as an officer of the court embroiled in the judicial phase of the criminal process." *Id.* at 514. Subjecting prosecutors to financial liability for making a *Brady* or *Giglio*

---

[2] Under *Brady*, a prosecutor violates a criminal defendant's due process rights when he fails to disclose evidence favorable to the defendant and material to guilt or punishment. 373 U.S. at 87. Under *Giglio*, a prosecutor is also required to disclose to the defense any material evidence which could undermine the reliability of a government witness. 405 U.S. at 154.

disclosure in court "could 'dampen the prosecutor's exercise of his … duty to bring to the attention of the court … all significant evidence suggestive of innocence or mitigation.'" *Id.* at 516 (quoting *Imbler*, 424 U.S. at 427 n.25).[3]

The question remains how to resolve the absolute immunity defense when a prosecutor takes another step and disseminates the *Brady* and *Giglio* information in some other way. In *Stockdale v. Helper*, the Sixth Circuit held that prosecutors did not have absolute immunity for sending *Giglio* letters to third parties. 979 F.3d 498, 501, 504–05 (6th Cir. 2020); *see also Krile v. Lawyer*, 947 N.W.2d 366, 379 (N.D. 2020); *Beck v. Phillips*, 685 N.W.2d 637, 645 (Iowa 2004).[4] In *Stockdale*, a prosecutor sent a message to a mayor, explaining her concern with two police officers' credibility and informing the mayor that she would file *Giglio* disclosures in cases that they were involved with. *Id.* at 501. The officers were soon fired; this message was the "sole reason" why. *Id.* at 501–02.

The Sixth Circuit reversed the grant of absolute immunity to the prosecutor for several reasons. *Id.* at 506. *First*, the

---

[3] The impact of *Giglio* and *Brady* is felt outside of the courtroom, too. To ensure that prosecutors have the most up-to-date information, they often maintain so-called "*Brady* lists" or "*Giglio* lists" that compile the names of officers with credibility problems. *See* NFOP Amicus Br. at 8–9. And many prosecutors also send "preemptive *Giglio* letters" that are meant to "inform an officer's employer of the state's refusal to call an officer as a witness at any future hypothetical trial." Jeffrey Steven McConnell Warren, *The Scarlet Letter: North Carolina,* Giglio, *and the Injury in Search of a Remedy*, 12 WAKE FOREST L. REV. ONLINE 24, 27 & n.16 (2022).

[4] Because § 1983 is read "in harmony with general principles of tort immunities and defenses," *Imbler*, 424 U.S. at 418, these state-court decisions are relevant to the extent they shed light on how absolute immunity for prosecutors has been understood writ large.

prosecutor's message was completely detached from any pending criminal case. *Id.* at 502, 504–05. Given that, the action was quite attenuated from the "initiation and conduct of a prosecution" that forms the heartland of absolute prosecutorial immunity. *Id.* at 504 (quoting *Burns*, 500 U.S. at 492). *Second*, the prosecutor's actions were solely administrative. *Id.* at 503. *Third*, a blanket *Giglio* warning is not a part of a prosecutor's duties. *Id.* at 504. That's because, to trigger a *Giglio* obligation, the evidence at issue must have more than a "tenuous connection" to a pending case to be material—and this is a decision that cannot be made in a vacuum. *Id.* (quoting *Hogan v. Hanks*, 97 F.3d 189, 191 (7th Cir. 1996)). We find the analysis in *Stockdale* persuasive.

A prosecutor's decision to communicate *Giglio* concerns outside of the judicial process is not "case-related advocacy"; instead, it's a "generic letter about generic cases." *Stockdale*, 979 F.3d at 504–05. In other words, the prosecutors are "merely advising [local law enforcement]," *Beck*, 685 N.W.2d at 646, or only "acting in an administrative capacity," *Krile*, 947 N.W.2d at 379, both things that are unprotected by absolute immunity, *Buckley*, 509 U.S. at 270.

Bearing in mind that absolute immunity cannot extend "further than its justification would warrant," we conclude that absolute immunity would not cover a prosecutor's blanket *Brady* or *Giglio* disclosures untethered to contemplated or existing charges. *Burns*, 500 U.S. at 487 (citation omitted). This action, though conducted by a prosecutor, would only tenuously be "related[] to the judicial phase of the criminal process," *Fields*, 672 F.3d at 510, and thus not "functionally prosecutorial," *Bianchi*, 818 F.3d at 316, falling outside the bounds of absolute immunity.

### 3. Brady/Giglio *Disclosures*

With this legal background, we turn now to the case at hand. Martin alleges that, after he resigned from his position, two prosecutors, Harrington and Biss, broadly distributed a "*Brady/Giglio* disclosure" document that stated that Martin used excessive force when conducting an arrest and then seemingly tried to cover it up with misleading police reports. Martin's allegations center on four different prosecutorial disclosures:

(1) Cases in which Martin was an arresting officer;

(2) With the Tippecanoe County Bar Association;

(3) With the Town of Dayton, Martin's part-time (and potential full-time) employer; and

(4) With the Town of Flora, Martin's potential prospective employer.[5]

The district court determined that the prosecutors' first two types of disclosures—in criminal cases and with the bar association—were entitled to absolute immunity. The court suggested, but did not hold, that the dissemination to Martin's current and potential employers would also be entitled to absolute immunity.

---

[5] In his complaint, paragraphs 44 and 45, Martin alleged that only Sheriff Goldsmith—and not the prosecutors—shared the disclosure with the Town of Flora. When asked about this at oral argument, however, Martin's counsel claimed that the allegation is "broad-based enough to cover … the actions of the prosecutors because they are the ones that helped draft this template disclosure." Oral Arg. at 5:48–6:01. We leave it to the parties to substantiate or rebut this assertion in discovery.

We agree with the district court as to the disclosures in criminal cases where Martin was involved. The prosecutors' decision to file *Brady* or *Giglio* disclosures in criminal cases is "intimately associated with the judicial phase of the criminal process." *Imbler*, 424 U.S. at 430; *Fields*, 672 F.3d at 513–14 ("*Brady* and *Giglio* violations breach a defendant's trial rights and are, thus, inherently prosecutorial in nature."). Absolute immunity for making these *Brady/Giglio* disclosures is therefore "justified for the function in question." *Burns*, 500 U.S. at 487. This is the case even if the prosecutors' motives in making these disclosures were vindictive or malicious. *See Tobey v. Chibucos*, 890 F.3d 634, 649–50 (7th Cir. 2018) (stating that "motives are irrelevant to the absolute immunity question").

Turning next to the prosecutors' *Brady/Giglio* disclosures with the Tippecanoe County Bar Association, the prosecutors argue that their goal in doing this was to make the information about Martin "known to attorneys prosecuting or defending cases in the county." Regardless of the merits of this justification, it bears only scant "relatedness to the judicial phase of the criminal process." *Fields*, 672 F.3d at 510. Absolute immunity extends to actions involving the initiation of a prosecution, the presentation of the state's case in court, or actions preparatory for these functions. *Buckley*, 509 U.S. at 278. The disclosure here had no obvious connection to any active criminal cases. Moreover, it was sent to a broad group of lawyers, many of whom appear to have no connection to criminal law. The disclosure "may well have been an act of advocacy; it just wasn't case-driven advocacy." *Stockdale*, 979 F.3d at 502.

Next is Prosecutor Biss's disclosure to the supervising police officer of the Town of Dayton, Martin's part-time

employer and potential future full-time employer. Biss told the officer that the information in the disclosure would have major impacts on the ability for the county prosecutors to prosecute suspects arrested by Martin. Martin's testimony, Biss asserted, would be "unusable."

This type of disclosure, unrelated to contemplated or existing charges, is not "functionally prosecutorial." *Bianchi*, 818 F.3d at 316. Even in the prosecutors' brief, they refer to this decision as "advising a law enforcement agency" within their county about Martin's viability as a witness. But "advising the police," does not "qualif[y] for absolute immunity." *Burns*, 500 U.S. at 493; *see Beck*, 685 N.W.2d at 645 ("[A] prosecutor's mere act of advising police is not a function to which absolute immunity attaches."); *Stockdale*, 979 F.3d at 503 (holding that absolute immunity did not attach when disclosure of *Brady/Giglio* information did not "serve a traditional advocacy function").

The same goes for the prosecutors' involvement in sharing the *Brady/Giglio* disclosure with the Town of Flora, where Martin had hoped to be hired. We cannot see any prosecutorial function here at all. Flora is *not* in Tippecanoe County, so the county prosecutors would not charge crimes arising out of there.[6] Viewed in the light most favorable to Martin, the allegations here reveal nothing more than "meddling with the hiring … decisions" within Flora's police department, which "simply [i]s not 'intimately associated with the judicial phase of the criminal process.'" *Stockdale*, 979 F.3d at 502 (quoting *Imbler*, 424 U.S. at 430).

---

[6] Oral Arg. at 29:31–45.

In summary, the prosecutors are entitled to absolute immunity as to their filing of *Brady*/*Giglio* disclosures within criminal cases. But they have not met their burden of showing that absolute immunity applies for their other *Brady*/*Giglio* disclosures to the Tippecanoe County Bar Association, the Town of Dayton, or the Town of Flora.

**B. Qualified Immunity**

We now consider whether Sheriff Goldsmith and the prosecutors (to the extent they are not absolutely immune) are entitled to qualified immunity. Qualified immunity protects government officials from civil liability to the extent that their conduct does not violate a clearly established statutory or constitutional right to which a reasonable person would have known. *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (citing *Harlow*, 457 U.S. at 818). To overcome the defense of qualified immunity, Martin must show (1) the defendants violated a constitutional right and (2) the right was clearly established at the time of the challenged conduct. *Doe v. Gray*, 75 F.4th 710, 716 (7th Cir. 2023).

1. *Constitutional Violation*

To establish step one, Martin relies on the Fourteenth Amendment, which prohibits state officials from "depriv[ing] any person of … property, without due process of law." U.S. CONST., amend. XIV, § 1. In Indiana, county police officers like Martin have a property interest in continued employment, as they may be fired only "for cause." IND. CODE § 36-8-10-11(a); *Marion Cnty. Sheriff's Merit Bd. v. Peoples Broad. Corp.*, 547 N.E.2d 235, 239 (Ind. 1989) ("That statute creates a legitimate claim of entitlement by the sheriff deputies to their jobs."). So, the critical question is therefore whether Martin got all the

process he was due before being deprived of this property interest.

The answer to this question hinges on whether Martin voluntarily resigned. "The general rule is that an employee who resigns—voluntarily relinquishing h[is] interest in continued employment—may not complain of a lack of due process." *Ulrey v. Reichhart*, 941 F.3d 255, 261 (7th Cir. 2019). But a *coerced* resignation may, in certain circumstances, form the basis of a due-process claim. *Id.* at 261–63. Notably, "a material misrepresentation that induces resignation can constitute coercion." *Id.* at 263; *see also Spreen v. Brey*, 961 F.2d 109, 112–13 (7th Cir. 1992).

Martin, accused of using excessive force, initially requested a merit board hearing as permitted by Indiana law. IND. CODE § 36-8-10-11(a). He subsequently agreed to resign and forego his hearing only after Sheriff Goldsmith agreed to drop the pending departmental charges and provide a neutral reference to future employers. Martin was led to believe these provisions, which were a part of a written severance agreement, would effectively "clear[] his name."

But unbeknownst to Martin—and just as the ink was drying on the severance agreement—the prosecutors, working in concert with Sheriff Goldsmith, shared details of Martin's alleged use of force and inconsistent reports with the county legal community, Martin's part-time employer, and Martin's prospective full-time employer.

Martin's allegations, read in the light most favorable to him, demonstrate that the defendants coerced Martin into resigning and forgoing his right to a hearing through "material misrepresentation[s]." *Ulrey*, 941 F.3d at 263. If true, these

allegations—making promises they never intended to keep and immediately violating the severance agreement—suggest that Martin's resignation was coerced under false pretenses, which could constitute a due process violation. *Id.*

### 2. *Clearly Established Right*

Having established that Martin properly alleged a deprivation of his constitutional rights, we move to the next step. The question is whether Martin's right to not be coerced into resigning was clearly established at the time of the disclosures.

For a right to be clearly established, its contours must be sufficiently clear that a reasonable official would understand that his conduct violates that right. *Hope v. Pelzer*, 536 U.S. 730, 739 (2002). A right can be defined too generally if the unlawfulness of the official's conduct "does not follow immediately from the conclusion that [the rule] was firmly established." *District of Columbia v. Wesby*, 583 U.S. 48, 64 (2018) (quoting *Anderson v. Creighton*, 483 U.S. 635, 641 (1987)). And so although establishing a right does not require a case directly on point, precedent still must place the constitutional question beyond debate. *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).

Prosecutors Harrington and Biss argue that they are shielded by qualified immunity because no case establishes that disclosing Martin's alleged conduct under *Brady* and *Giglio* violated his constitutional rights. But that argument misses the mark—Martin did not allege that the disclosures themselves violated his rights. Instead, he alleged that the disclosures were sent despite Sheriff Goldsmith's representations that Martin's resignation would make the charges go

away. The disclosures were therefore part of the misrepresentations that induced Martin into resigning.

The right not to be induced into resigning from public employment through material misrepresentations was clearly established at the time of this alleged conduct. *See Spreen*, 961 F.2d at 112 (holding that plaintiff had a "clearly established constitutional right" not to be induced into resigning from public employment through the "making [of] … misrepresentations" about the consequences of resignation); *see also Dusanek v. Hannon*, 677 F.2d 538, 543 (7th Cir. 1982).

A reasonable official in Sheriff Goldsmith's position would be on notice that making misrepresentations to induce Martin to voluntarily resign is a procedural due process violation. Based on these facts, at this stage of the case, the defendants are not entitled to qualified immunity. But "while qualified immunity may not entitle a defendant to dismissal on the pleadings, qualified immunity may entitle the defendant to summary judgment later on." *Hanson v. LeVan*, 967 F.3d 584, 592 (7th Cir. 2020).[7]

### III.   CONCLUSION

In sum, the prosecutors are entitled to absolute immunity for their filing of *Brady/Giglio* disclosures in Martin's criminal

---

[7] Martin also named the State of Indiana and the Tippecanoe County (Indiana) Board of Commissioners as defendants. His counsel admitted at oral argument that these parties were sued only to indemnify the other defendants were Martin to be awarded money damages. Oral Arg. at 2:19–3:00. These theories are derivative of any claim against Goldsmith, Harrington, and Biss. On remand, we leave it to the district court to decide the state law claims, including whether it is necessary or appropriate for these entities to remain as named defendants in the case.

cases. The rest of Martin's allegations against the prosecutors and the sheriff, however, are sufficient to get past the pleading stage, as none of the defendants—at present—are entitled to qualified immunity. Because the district court granted the defendants' motion to dismiss in its entirety, we REVERSE in part, AFFIRM in part, and REMAND for proceedings consistent with this opinion.