In the

# United States Court of Appeals
## For the Seventh Circuit

No. 19-1221

LISA ULREY,

*Plaintiff-Appellant,*

*v.*

WILLIAM REICHHART and
SCHOOL BOARD OF MANCHESTER COMMUNITY SCHOOLS,

*Defendants-Appellees.*

Appeal from the United States District Court for the
Northern District of Indiana, South Bend Division.
No. 3:16-cv-257-JD — **Jon E. DeGuilio**, *Judge.*

ARGUED SEPTEMBER 5, 2019 — DECIDED OCTOBER 18, 2019

Before SYKES, HAMILTON, and SCUDDER, *Circuit Judges.*

HAMILTON, *Circuit Judge.* Plaintiff Lisa Ulrey served as the assistant principal of the Manchester Junior-Senior High School until November 4, 2014, when she resigned during a meeting with William Reichhart, the school district's superintendent. Ulrey brings two claims in this suit under 42 U.S.C. § 1983 against Reichhart and the school board. First, she claims that Reichhart violated her rights under the First

Amendment by retaliating against her for her speech about a student discipline issue. Second, she contends that the defendants violated her Fourteenth Amendment rights by coercing her to resign, depriving her of her property interest in her job without due process of law. The district court granted summary judgment to the defendants on both claims. We affirm. Undisputed facts show that Ulrey spoke about the discipline issue in her capacity as an employee, so the First Amendment did not protect her speech. Ulrey also failed to present evidence sufficient to support a finding that her resignation was involuntary.

I.   *Claim for First Amendment Retaliation*

Citizens do not surrender their First Amendment rights by accepting public employment, but legal doctrine in this field tries to maintain a careful balance between the interests of the employee as a citizen and the interests of the employer-government in serving the public. *Lane v. Franks*, 573 U.S. 228, 231 (2014), citing *Pickering v. Board of Education*, 391 U.S. 563, 568 (1968). The First Amendment claim here arises from a disagreement between plaintiff Ulrey and defendant Reichhart concerning student discipline. Because we review a grant of summary judgment against Ulrey, we recount facts in the light reasonably most favorable to her. See *Healy v. City of Chicago*, 450 F.3d 732, 738 (7th Cir. 2006).

In August 2014, Superintendent Reichhart granted an adult student permission to possess cigarettes (though not to smoke them) on school grounds. Ulrey learned of that decision and disagreed with it. Without approaching Reichhart first, Ulrey called the president of the school board, Sally Krouse. Krouse in turn emailed Reichhart to express her concern about his decision. Reichhart then rebuked Ulrey for

going over his head, threatening to reprimand her formally if she did not apologize. She did apologize. She claims in this lawsuit, however, that Reichhart forced her to resign three months later to retaliate against her for her call to Krouse.

In maintaining the critical balance under the *Pickering* and *Lane* line of cases, the threshold question in a public employee's First Amendment retaliation suit is whether the employee's speech was constitutionally protected. E.g., *Swetlik v. Crawford*, 738 F.3d 818, 825 (7th Cir. 2013). If Ulrey's call to Krouse had been protected speech, then we would need to decide whether Ulrey presented evidence that her call motivated Reichhart to inflict on her deprivations likely to deter speech. *Id.*

We do not need to reach those issues, however, because Ulrey's speech was unprotected as a matter of law. See *Connick v. Myers*, 461 U.S. 138, 148 n.7 (1983) (noting that the "inquiry into the protected status of speech is one of law, not fact"). Ulrey's claim fails at this first step. The undisputed facts show that she spoke to Krouse as an employee, not a private citizen. "In order for a public employee to raise a successful First Amendment claim for her employer's restriction of her speech, the speech must be in her capacity as a private citizen and not as an employee." *McArdle v. Peoria School Dist. No. 150*, 705 F.3d 751, 754 (7th Cir. 2013). The test for distinguishing private speech from employee speech is whether the employees speak "pursuant to their official duties." *Spiegla v. Hull*, 481 F.3d 961, 965 (7th Cir. 2007), quoting *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006).

Ulrey argues that reporting the superintendent's alleged misconduct or violation of district policy on tobacco fell outside her official duties. Since the Supreme Court decided

*Garcetti*, however, we have repeatedly rejected such claims for a whistleblower carve-out from the category of unprotected employee speech. In *Garcetti*, the employee wrote a memorandum detailing governmental misconduct. The Supreme Court held that his speech was unprotected because the memorandum "was written pursuant to [his] official duties." 547 U.S. at 421. *Garcetti* suggested that "legislative enactments" such as "whistle-blower protection laws and labor codes," rather than the First Amendment, ought to protect employees obliged to report official misconduct as part of their job. *Id.* at 425.

Shortly after *Garcetti* was decided, we applied it to a case like Ulrey's. In *Spiegla*, a prison guard stationed at the main gate reported her supervisor for letting a vehicle pass without the required search for contraband. See 481 F.3d at 962–63. We held that the guard "spoke as an employee, not a citizen, because ensuring compliance with prison security policy was part of what she was employed to do." *Id.* at 966. The fact that her statements "highlighted potential misconduct by prison officers" did not affect the analysis under *Garcetti*. *Id.* at 967.

As the district court recognized, we have applied this reasoning in many different employment contexts. See, e.g., *Kubiak v. City of Chicago*, 810 F.3d 476, 481 (7th Cir. 2016) (police officer reporting misconduct of co-worker); *McArdle*, 705 F.3d at 753 (school principal reporting misconduct of district academic officer); *Renken v. Gregory*, 541 F.3d 769, 772 (7th Cir. 2008) (professor reporting misconduct of dean); *Vose v. Kliment*, 506 F.3d 565, 570 (7th Cir. 2007) (police supervisor reporting misconduct of detectives); see also *Ulrey v. Reichhart*, 2018 WL 6435652, at *4–6 (N.D. Ind. Dec. 7, 2018).

This line of decisions—which Ulrey failed to acknowledge or address in the district court and on appeal, even after the district court relied upon them—required summary judgment for defendants. Even if Superintendent Reichhart violated school district policy by making an exception allowing an adult student to possess cigarettes when he attended school, Ulrey's speech fell within her official duties. Her written job description included duties to "coordinate and administer student attendance and discipline policies," just as the guard in *Spiegla* was paid to monitor vehicles coming into the prison. Ulrey's complaint to the school board president fell within the scope of her job and was unprotected employee speech, not protected citizen speech.

The two cases that Ulrey relies on do not help her position. In both *Lane v. Franks*, 573 U.S. 228 (2014), and *Chrzanowski v. Bianchi*, 725 F.3d 734 (7th Cir. 2013), the plaintiffs' speech was protected because they spoke as citizens, in non-employee capacities, not because they reported misconduct. In *Lane*, the Supreme Court held that sworn testimony given under subpoena in a criminal trial was citizen speech even though the plaintiff was testifying against a former co-worker about misconduct in their office. 573 U.S. at 239. Similarly, in *Chrzanowski*, we held that a prosecutor who testified against his supervisor before a grand jury and at trial spoke as a citizen. 725 F.3d at 739–40. These cases turned on the speech's context, not its content. See *Lane*, 573 U.S. at 240 ("The critical question under *Garcetti* is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties."); see also *Swetlik*, 738 F.3d at 826 (observing that employee's statements in police union meetings and grievances reporting police chief's misconduct submitted by plaintiff in his capacity as a union

member were not employee speech). Ulrey's call to the school board president was not comparable to sworn testimony before a court or grand jury.

Ulrey raises one other point that, she argues, creates a dispute of material fact to preclude summary judgment. The adult student whom Reichhart had allowed to possess cigarettes attended a special program called "Squire Academy"—named for the school mascot—that operated somewhat independently from the high school. Accepting Ulrey's allegations as true, her authority to enforce the student handbook did not extend to Squire Academy students. Ulrey argues that her speech to Krouse thus fell outside her duties as assistant principal.

We disagree. This administrative division cannot bear the weight Ulrey places on it. Squire Academy occupied the same building complex as the high school, and Ulrey states that she had "administrative responsibility" over the "physical classroom" in which it met. Explaining her decision to call Krouse, Ulrey testified that "students should not be allowed to have tobacco on school property for any reason" because it was "against the student handbook." She also confirmed that she was "angry because of [her] role in enforcing the handbook." Squire Academy disciplinary decisions bore closely on Ulrey's duties even if she lacked total control over them, and we do not parse the precise scope of employees' duties as finely as Ulrey argues. See, e.g., *Vose*, 506 F.3d at 571 (holding that police officer's report of misconduct in a separate unit of the police department was employee speech). The district court correctly granted summary judgment on the First Amendment claim.

II. *Claim for Denial of Due Process*

Ulrey's due-process claim stems from her resignation on November 4, 2014, three months after her call to the school board president. When a public employee has a property interest in his or her continued employment, typically shown by proving that the employee may be fired only for good cause, the state may not terminate the employment without due process of law. E.g., *Phelan v. City of Chicago*, 347 F.3d 679, 681 (7th Cir. 2003); see generally *Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 538 (1985); *Board of Regents v. Roth*, 408 U.S. 564, 577 (1972). Reichhart and the School Board agree that Ulrey had a protected interest in continued employment. Indiana gives public school teachers and administrators statutory protections that spell out the details of procedures used to vindicate this due process right. See Ind. Code § 20-28-7.5-1 et seq. (2014) (teachers); Ind. Code § 20-28-8-2 (2014) (principals and assistant principals).[1]

If Reichhart had tried to fire Ulrey, these procedural protections would have been available to her. She did not invoke these procedural protections because she resigned. The general rule is that an employee who resigns—voluntarily relinquishing her interest in continued employment—may not complain of a lack of due process. See *Palka v. Shelton*, 623 F.3d 447, 453 (7th Cir. 2010) (affirming dismissal of due-process claim by employee who resigned). There are narrow exceptions, however. In *Palka* we identified two types of

---

[1] Principals and assistant principals like Ulrey work under the regular teacher's contract. See Ind. Code § 20-28-8-2(1). Indiana substantially revised the grounds and procedures for cancelling teacher contracts in 2011, but those amendments are not relevant here. See *Elliott v. Bd. of School Trustees of Madison Consol. Schools*, 876 F.3d 926, 928–30 (7th Cir. 2017).

"involuntary resignation" that amount to termination: con-structive discharge and coerced resignation. "Constructive discharge" is akin to a hostile work environment claim and may occur "when an employer makes employment so un-bearable that an employee resigns." *Id.*; see *Pennsylvania State Police v. Suders*, 542 U.S. 129, 146–47 (2004) (explaining com-parison to hostile work environment). Coerced resignation, on the other hand, is "characterized by the presence of a Hob-son's choice in which the employee must resign or suffer se-vere consequences, such as facing criminal charges." *Palka*, 623 F.3d at 453.

These two types of involuntary resignation are closely re-lated. See *Patterson v. Portch*, 853 F.2d 1399, 1405–06 (7th Cir. 1988). The primary distinction may be temporal: Whereas constructive discharge results when an employee must en-dure intolerable working conditions over some period of time, a specific threat or misrepresentation concerning future harm can provoke a coerced resignation. See *Graehling v. Vil-lage of Lombard*, 58 F.3d 295, 297–98 (7th Cir. 1995) (likening coerced resignation to signing a resignation letter at gun-point).

Before considering whether Ulrey can avoid summary judgment under either theory, we summarize the events that led up to Ulrey's resignation on November 4, 2014. Where there are disputes, we credit Ulrey's account because we are reviewing a grant of summary judgment against her. The problems apparently began with faulty processing of teach-ing licenses at nearby Manchester University, where Ulrey had studied for her most recent license renewal. In an October 28 email, Reichhart notified all district teachers of potential errors on such licenses and stressed the serious nature of

licensing defects. Later that morning, Ulrey logged on to a state website to check her own license. She discovered a problem and promptly notified her superiors, including Reichhart. The error related to Ulrey's eligibility to hold an administrative license, which she needed to serve as an assistant principal.

That same day, Reichhart called the state Department of Education with Ulrey present. A state official told them that the error could be resolved. The next morning, the official contacted Ulrey to ask permission to remove false entries, and she promptly agreed. Yet Reichhart's concerns were not assuaged; he emailed Ulrey on October 31 because he could not find her corrected license online. That same day, he met in his office with Ulrey and two others: Nancy Alspaugh, the high school principal, and Scott Bumgardner, the business manager. In the meeting, Reichhart berated Ulrey for the error and implied that he did not believe it had been an honest mistake.

Tensions came to a head on November 4, when Reichhart again called a meeting with Ulrey, Alspaugh, and Bumgardner. Reichhart stated that he could not "get past" the licensing situation. According to her testimony, Ulrey was "baffled" and "asked him if he was asking for my resignation." Reichhart replied that he was. He then handed her a letter of resignation he had already prepared for her. Ulrey signed the letter during the meeting. That same night, the school board approved Ulrey's resignation on its consent agenda.

Ulrey argues that these facts present a genuine dispute as to whether her resignation was coerced. Ulrey does not commit herself to either legal test for involuntary resignation; rather, she asks us to consider what she describes as a "reasonable person" standard, arguing that a trier of fact must always

determine the voluntariness of a resignation. Yet, as summarized above, the tests for constructive discharge and coerced resignation do not ask generically whether a reasonable employee would perceive a "free choice." Ulrey needed to produce evidence upon which a reasonable jury could rule in her favor under one of the established formulas for involuntary resignation. For due-process purposes, there is a critical difference between a resignation and a discharge, and that difference must be protected by insisting that the exceptions for constructive discharges and coerced resignations be kept narrow. The test is not whether the employee who resigned was happy about resigning or even whether the employer asked for the resignation.

Taking the exceptions in turn, Ulrey's case is not a good fit for constructive discharge. She claims that she felt coerced to resign in a specific meeting with her supervisor, not that her conditions of employment became intolerable over time. A constructive discharge can result from a hostile work environment only if the environment is "even more egregious than that needed for a hostile work environment." *Thompson v. Memorial Hosp. of Carbondale*, 625 F.3d 394, 401 (7th Cir. 2010). Ulrey has not presented evidence of conditions even approaching that high standard.[2]

---

[2] Constructive discharge can sometimes refer to a situation where "an employer acts in a manner so as to have communicated to a reasonable employee that she will be terminated." *Wright v. Illinois Dep't of Children & Family Servs.*, 798 F.3d 513, 527 (7th Cir. 2015). But only at-will employees can show constructive discharge under this approach. Employees who enjoy due-process protections cannot assume that the start of termination proceedings will result in termination. See *Cigan v. Chippewa Falls School*

Ulrey's theory also falls well short of creating a genuine dispute of material fact under a coerced resignation theory. The most a jury could infer is that Reichhart threatened to fire Ulrey because of the licensing errors. Reichhart, for instance, admits that he told Ulrey it was in her "best interest" to resign. But the possibility of eventual termination, without more, cannot render a resignation involuntary; otherwise, a due process violation would result whenever a public employee resigned rather than asserting his or her (usually extensive) procedural rights. See *Palka*, 623 F.3d at 453 ("That Palka decided to resign rather than risk an unfavorable Merit Board decision does not make his resignation involuntary.").

In contrast, the rare, legally viable claims of coerced resignation have typically involved threats beyond termination, such as criminal prosecution or physical harm. See, e.g., *Benuzzi v. Board of Education of the City of Chicago*, 119 F. Supp. 3d 917, 927 (N.D. Ill. 2015) (denying motion for summary judgment where jury could find that plaintiff retired in response to threat of criminal prosecution); *Lynd v. Bristol Kendall Fire Protection Dist.*, 2012 WL 3069391, at *4 (N.D. Ill. July 26, 2012) (denying motion to dismiss; plaintiff alleged he resigned in response to threats to harm his family). We have also held that a material misrepresentation that induces resignation can constitute coercion. See *Spreen v. Brey*, 961 F.2d 109, 112–13 (7th Cir. 1992) (affirming denial of summary judgment for employer on due-process claim where employee said she was threatened with loss of vested pension benefits if she did not resign and were instead fired); cf. *Covington v. Dep't of Health & Human Services*, 750 F.2d 937, 942 (Fed. Cir. 1984) (federal

---

*Dist.*, 388 F.3d 331, 333 (7th Cir. 2004) ("The only way to know how matters will turn out is to let the process run its course.").

retirement considered involuntary if employee relies on mis-information, whether error is intentional, negligent, or innocent); *Scharf v. Dep't of the Air Force*, 710 F.2d 1572, 1575 (Fed. Cir. 1983) (same). Here, Ulrey offered to resign because Reichhart's "vibes" and "physical demeanor" communicated his desire to fire her. That simply is not enough to treat defendants as if they had denied plaintiff the extensive procedural protections available to her if she had wanted to contest a possible termination.

The judgment of the district court is

AFFIRMED.