*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# S T A T E   O F   M I C H I G A N

# C O U R T   O F   A P P E A L S

ERIN KOSCH,

Plaintiff-Appellant,

v

TRAVERSE CITY AREA PUBLIC SCHOOLS and
CINDY BERCK,

Defendants-Appellees.

FOR PUBLICATION
August 22, 2024
9:35 a.m.

No. 364955
Grand Traverse Circuit Court
LC No. 21-035856-CK

Before: RIORDAN, P.J., and RICK and N. P. HOOD, JJ.

RIORDAN, P.J.

Plaintiff Erin Kosch appeals as of right the trial court's January 31, 2023 order granting summary disposition in favor of defendants Traverse City Area Public Schools ("TCAPS") and Cindy Berck ("Berck") pursuant to MCR 2.116(C)(7) and (C)(10). On appeal, plaintiff argues that the trial court erred by dismissing her claim for a procedural due-process violation because defendants wrongfully deprived her of continued tenure, that she was not required to exhaust her administrative remedies before filing the instant lawsuit, and that she established a claim for intentional infliction of emotional distress. We affirm.

## I. FACTS

On July 13, 2021, plaintiff filed her complaint against defendants. She alleges that she was a teacher with 27 years of seniority when she was constructively discharged by TCAPS through its director of human resources, Berck. Plaintiff states that in October 2020, she inadvertently broadcast to a student on an audiovisual classroom feed of her remote-teaching software, a brief conversation with her husband about another student. She says that she intended for that conversation to be private between her and her husband, and not accessed by any third parties, including the student who overheard and recorded the conversation.

Eventually, the recorded copy of the conversation made its way to social media and was viewed widely in the TCAPS community. TCAPS commenced an investigation of the matter, but after one, brief meeting with Berck, plaintiff resigned her position. Plaintiff then filed her

-1-

complaint. Count I alleges breach of contract by defendants,[1] Count II alleges intentional infliction of emotional distress by Berck, and Count III alleges violation of her federal and state procedural due-process rights by defendants. With regard to Count III, plaintiff argues that she was a tenured teacher with a property right in continuing in her tenured position with the TCAPS.

Defendants filed a notice of removal to the federal district court on the basis that plaintiff maintained a federal procedural due-process claim. On November 1, 2021, the federal district court[2] declined to exercise supplemental jurisdiction over the state-law claims, and instead only retained plaintiff's federal claim of Count III of her complaint.

On March 20, 2023, the federal district court granted defendants' motion for summary judgment. *Kosch v Traverse City Area Pub Sch*, 662 F Supp 3d 774 (WD Mich, 2023). In its opinion, the court set forth a summary of relevant facts:

> Erin Kosch began working for TCAPS in September 2002. She had previous experience, and at the time of her separation in October 2020, she was somewhere around two or three years shy from having thirty years of service. The record is not precisely clear as to what grade or grades Ms. Kosch taught, but it appears she taught history classes to students of high school age. In 2020, under the law in Michigan at the time, Ms. Kosch was not a dues-paying member of the teacher's union, but she enjoyed the protection of a collective bargaining agreement and Michigan state tenure law.

> 1. The Simmering Dispute Between Teachers

> The events of this lawsuit took place in October and November of 2020, but as Ms. Kosch frames it, the real story starts several years earlier. Ms. Kosch contends that she had a long-running dispute with another teacher at TCAPS named Joyce Battle. Ms. Battle had school-age children in TCAPS. For fifteen years Ms. Battle harassed the teachers and administrators who taught her children. In their depositions, TCAPS' Principal, Jessie Houghton, and Vice Principal, Ben Berger, agreed that Ms. Battle and her husband were "difficult parents." During the events at issue in this case one of Ms. Battle's children, M.B., was a student in Ms. Kosch's classroom.

> 2. M.B. Makes Inappropriate Remarks in Ms. Kosch's Online Classroom

> In the fall of 2020, TCAPS engaged in virtual learning due to the COVID-19 pandemic. For at least some classes, Ms. Kosch taught from her home and students would log in for synchronous learning. At some point before October 22, 2020, Ms. Kosch observed M.B. make inappropriate, homophobic remarks in the chat bar of one of the online classrooms. It is unclear what, if anything, Ms. Kosch

---

[1] The complaint did not identify the controlling contract or explain how it was breached.

[2] Judge Robert J. Jonker presided over the case.

did to address the behavior, but there does not appear to have been any formal discipline imposed, or a permanent record in M.B.'s file about the incident.

Ms. Kosch later spoke with the assistant principal, Ben Berger, about M.B.'s behavior.

### 3. Ms. Kosch's Conversation with her Husband about M.B. is Recorded and Distributed

On October 22, 2020, one of Ms. Kosch's students, L.H., signed on early to her online 6th hour history class. L.H. testified she saw Ms. Kosch on the screen and said "hello," but she received no response, and L.H. muted herself. L.H. then heard Ms. Kosch make a remark concerning "little assholes," which led her to take out her phone and record Ms. Kosch. What followed was a conversation between Ms. Kosch and her husband at their home that was broadcast over the open online classroom meeting.

The video of the incident is included in the record. A transcript is also provided in Ms. Kosch's brief. The recorded conversation reflects Ms. Kosch's recounting to her husband of the discussion she had with Ben Berger. Ms. Kosch told her husband that in describing the earlier incident, she told Ben Berger, "just so you know, one of the culprits is M.B." Ms. Kosch and Mr. Berger then proceeded to reference the historical issues with Ms. Battle, and Mr. Berger commented "good luck with that one" and Ms. Kosch replied "trust me I know." Ms. Kosch also commented that someone should "shut her [that is Ms. Battle] shit down." Ms. Kosch's husband agreed, and Ms. Kosch proceeded to refer to Ms. Battle's "fucking little kid" that is, M.B.

At that point Ms. Kosch realized that she was broadcasting the conversation, and the video ended.

### 4. TCAPS Becomes Aware of the Recorded Conversation and Suspends Ms. Kosch With Pay

The recorded video found its way to M.B. and to M.B.'s parents. An edited version of the video also circulated widely within the TCAPS' community. Ms. Battle sent the video to Principal Houghton to complain. Principal Houghton responded that she would look into it. Ms. Battle's husband, John, also complained to Shaina Biller, TCAPS' Associate Superintendent, via email, about the video.

On Monday, October 26, 2020, Principal Houghton informed TCAPS' H.R. Director, Defendant Cindy Berck, about the complaint and video. Ms. Berck said the complaint alleged serious misconduct that needed to be investigated. She told Principal Houghton to suspend Ms. Kosch. Principal Houghton then called Ms. Kosch to inform her of the suspension based on the direction she received both from Ms. Berck and Ms. Biller. Ms. Berck also sent a written memo to Ms. Kosch on October 26, 2020, stating that Ms. Kosch was "suspended with pay" pending the outcome of an investigation into the allegations. Ms. Berck wrote that she would

contact Ms. Kosch on October 27, 2020, to arrange a meeting time to discuss things; in the meantime, Ms. Kosch was not to contact any TCAPS' staff, students, or parents.

### 5. October 27, 2020, Meeting

Ms. Berck arranged a pre-deprivation meeting for October 27, 2020. She told Ms. Kosch that it was a "due process meeting" in response to a complaint TCAPS had received and that the investigation could result in disciplinary action. Ms. Kosch was also told she could have a union representative attend the meeting.

Ms. Kosch was not opposed to having a union representative at the meeting, but she did not think the representative would stand for her interests since she was not a dues-paying member of the union. Ms. Kosch wanted a lawyer at the meeting as well. Ms. Berck denied the request for a lawyer at the meeting, though nothing Ms. Berck said or did prevented Ms. Kosch from consulting with counsel of her choice before or after the meeting. Ms. Berck called the union representative, Ms. McBride, to represent Kosch at the meeting.

During the October 27th meeting, Ms. Berck told Ms. Kosch that she was being investigated for potential violations of [the Family Educational Rights and Privacy Act (FERPA), 20 USC 1232g] and TCAPS' policies. Ms. Berck kept notes of the meeting. The notes reflect that at least two options for moving forward were discussed: 1) resignation, with insurance continuing through the end of January; and 2) a recommendation that tenure charges be filed with the Board of Education for violating FERPA and TCAPS policies. If the latter route were pursued, the notes indicate that the board's vote would be public, and so Ms. Kosch's name would be made public.

Ms. Kosch says that she understood from these options that she could either resign in good standing, with the possibility of getting other work that would let her complete her thirty years of service; or she could take her case to the school board and carry the risk that she would be fired and placed in a position where no one would hire her. There was no real choice to be made, she says. In her mind, she only had one option if she wanted to maximize her pension: resign. Even though this was the conclusion she drew, she does not allege that anyone from TCAPS said this to her directly, or that she told anyone from TCAPS this was her conclusion at the end of the meeting.

### 6. Resignation

After the meeting, but still on the day of the meeting, Ms. Kosch received an email from an out of district student about the video. She realized that the video had gone viral. That evening, Ms. Kosch emailed Ms. Berck to tender her resignation. She followed up with a formal notice . . . .

Ms. Kosch testified that as she processed her decision to resign over the following months, she grew to regret her decision. But she felt that TCAPS gave

-4-

her no other option but to resign. She felt that of the options she had, resigning best protected her pension. She ultimately filed this lawsuit. [*Id*. at 778-781 (cleaned up).]

The federal district court dismissed the federal procedural due-process claim on the basis that plaintiff "was not deprived of any property interest" under the Teacher's Tenure Act (TTA), MCL 38.71 *et seq*., because she voluntarily resigned; that she was not constructively discharged under caselaw of United States Court of Appeals for the Sixth Circuit governing constructive discharge; that she received adequate process; and that she failed to exhaust her remedies under the collective bargaining agreement (CBA). *Id*. at 782-787.

Meanwhile, in state court, on December 2, 2022, defendants moved for summary disposition of the state-law claims under MCR 2.116(C)(7) and (C)(10). Defendants argued that "Plaintiff's exclusive remedy under her contract and TCAPS' Master Agreement is to pursue a grievance," and because she did not, "her pursuit of the instant action is barred." Defendants also argued that the breach-of-contract claim was meritless because, although "[a] tenured teacher can only be terminated when administration brings tenure charges to the Board of Education," plaintiff was not terminated in this case. According to defendants, "the resignation was not coerced by administration in any way." Moreover, defendants argued that Berck was entitled to governmental immunity and that her conduct did not amount to intentional infliction of emotional distress.

Plaintiff, in response, argued that she was constructively discharged because she was forced to resign in light of (1) defendants' unlawful use of the recording contrary to the eavesdropping statute, MCL 750.539c; (2) defendants' refusal to allow her to be accompanied by counsel during the meeting with Berck; (3) the fact that she was provided with a union representative who was opposed to her interests;[3] (4) the fact that defendants lied to her about whether her statements to her husband violated FERPA;[4] and (5) the fact that she would not have been terminated in the ordinary course of proceedings because she had an excellent teaching record. Plaintiff argues that these facts establish a violation of her procedural due-process rights. Plaintiff further argued that she was not required to exhaust her administrative remedies because doing so would be futile, as she was not a member of the union, the union representative provided to her was hostile to her interests, and she was "entitled to a variety of damages and awards that

---

[3] The union representative provided to plaintiff during the meeting, Allyson McBride-Culver, had been contacted around that time by Battle, M.B.'s mother, about potentially filing a hostile-work-environment complaint against plaintiff on the basis of plaintiff's recorded conversation. Culver did not disclose to plaintiff the fact that Battle had reached out to her. Culver explained during her deposition that she did not believe that there was a conflict because these events occurred within a relatively short period of time. She implied that if the situation had "gone on longer," she might have had a conflict. She also implied that a decision to file Battle's complaint was made the day after the meeting.

[4] As explained *infra*, defendants believed that the communication from plaintiff to her husband may have violated FERPA. Apparently, however, no final conclusion was reached regarding this question because plaintiff resigned in the early stages of the investigation. Nonetheless, as plaintiff observes, there is a reasonable argument that her communication did not violate FERPA.

are not susceptible of being obtained through a grievance procedure." Finally, plaintiff argues that Berck was not entitled to "qualified immunity" for her egregious conduct in this case, and that her conduct constituted intentional infliction of emotional distress.

At the January 23, 2023 motion hearing on the matter, the trial court granted defendants' motion on the record, reasoning as follows:

> And now, as the Court stated, the all of the documentation that can be reviewed by the Court has to be viewed in a light most favorable for the plaintiff. And even when doing that -- you know, in the plaintiff's deposition she said that she thought it was appropriate for the school to put her on paid administrative leave. She thought it was appropriate for the school to investigate what happened. She stated that she never filed a grievance, or went through any administrative remedies that were available to her.
>
> As I mentioned, the president of the union did attend a meeting with Dr. Berck that occurred on the 27th. And Dr. Berck, even in the plaintiff's words in the deposition, went through what the plaintiff's options were, but did not make recommendations about what she should do. I think the phrasing was she never really gave an opinion on outcomes. The issue came up at a board meeting.
>
> She was aware of that. She never attended. She stated that TCAPS never terminated her. And as I mentioned, she resigned on the 27th. Nothing in her letter alleged that she was forced to do that, or that anything improper had been done.
>
> Depositions with some other folks who were in that meeting don't list any allegations that anything was improper about the meeting that occurred on the 27th. . . .
>
> * * *
>
> She obviously was aware that students would be coming into the classroom. It was not as though she was having this private conversation and somebody -- somebody remotely hacked to go into a camera or something that was in her home. As to Dr. Berck, the Court does believe that governmental immunity applies in this case, and that it does apply to her. In terms of due process and those allegations that were made, it's important to note that this process that TCAPS was undertaking was extremely early in the process.
>
> The phrase "preinvestigation" has been used, because it was the day after that they found out that this happened, the parties indicate -- and I don't mean the parties to the action, I mean the parties that were deposed -- which the Court reviewed for this hearing, indicated that it was going to be investigated. That was going to be pursued by them. But that stopped, obviously, when the plaintiff resigned. And -- so it was not allowed to be fleshed out. The plaintiff did not exhaust her administrative remedies.

-6-

The basis for not having to do that were not met in this case. There's no indication, even when viewing the record in her favor, that that it would have been futile. That anything about the union representation was hostile. Certainly the union may have to represent multiple individuals, but there's nothing to indicate that that was transpiring here.

The same day, the trial court entered an order granting defendants' motion for summary disposition "for the reasons stated on the record."

This appeal followed.

## II. STANDARD OF REVIEW

"This Court reviews de novo a trial court's grant of summary disposition under MCR 2.116(C)(7) and (C)(10)." *McLean v Dearborn*, 302 Mich App 68, 72; 836 NW2d 916 (2013). "In reviewing a motion for summary disposition under MCR 2.116(C)(7), a court considers the affidavits, pleadings, and other documentary evidence presented by the parties and accepts the plaintiff's well-pleaded allegations as true, except those contradicted by documentary evidence." *Id*. at 72-73. "In reviewing a motion under MCR 2.116(C)(10), the trial court considers affidavits, pleadings, depositions, admissions, and other evidence introduced by the parties to determine whether no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law." *Id*. at 73. "The evidence submitted must be considered in the light most favorable to the opposing party." *Id*. (quotation marks and citation omitted).

## III. PROCEDURAL DUE PROCESS

Plaintiff first argues that the trial court erred by dismissing her claim for a violation of procedural due process under state law. Plaintiff contends that she was constructively discharged because (1) she was denied counsel during the meeting with Berck, (2) the union representative provided to her for the meeting was biased against her, (3) use of the recording by defendants violated the state eavesdropping statute, (4) defendants lied to her by indicating that she violated FERPA, and (5) she was threatened with the inability to obtain comparable work in the future and maximize her pension. Plaintiff reasons that because she undisputedly had a property interest in continued tenure, her constructive discharge violated procedural due process. We disagree.

The Michigan Constitution "preclude[s] the government from depriving a person of life, liberty, or property without due process of law." *Galien Twp Sch Dist v Dep't of Ed (On Remand)*, 310 Mich App 238, 241; 871 NW2d 382 (2015) (quotation marks and citations omitted). See Const 1963, art 1, § 17. "A procedural due process analysis requires a dual inquiry: (1) whether a liberty or property interest exists which the state has interfered with, and (2) whether the procedures attendant upon the deprivation were constitutionally sufficient." *Galien Twp*, 310 Mich App at 241 (quotation marks and citations omitted).

The primary purposes of the TTA "are to maintain an adequate and competent teaching staff, free from political and personal interference, and to protect teachers from arbitrary and capricious employment practices of school boards." *Tomiak v Hamtramck Sch Dist*, 426 Mich 678, 686-687; 397 NW2d 770 (1986) (citations omitted). In relevant part, the TTA "protect[s] tenured teachers from being demoted or discharged unless the board can show just and reasonable

cause, and only after written charges are filed and the teacher has been furnished with notice of the date of a hearing." *Id*. at 688-689. "Because continued employment is a protected property interest, a termination of that interest requires conformity to the requirements of due process under . . . Const 1963, art 1, § 17." *Id*. at 700.

"The essential requirements of due process . . . are notice and an opportunity to respond. The opportunity to present reasons, either in person or in writing, why a proposed action should not be taken is a fundamental due process requirement." *Cleveland Bd of Ed v Loudermill*, 470 US 532, 546; 105 S Ct 1487; 84 L Ed 2d 494 (1985).[5] "The tenured public employee is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story." *Id*. "The pretermination hearing . . . need not definitively resolve the propriety of the discharge. It should be an initial check against mistaken decisions—essentially, a determination of whether there are reasonable grounds to believe that the charges against the employee are true and support the proposed action." *Plymouth-Canton Comm Sch v State Tenure Comm'n*, 435 Mich 76, 86; 457 NW2d 656 (1990) (cleaned up).

Federal courts have explained that "if an employee voluntarily relinquishes a property interest, then no procedural due process violation has occurred." *Narotzky v Natrona Co Mem Hosp Bd of Trustees*, 610 F3d 558, 564 (CA 10, 2010).[6] In some cases, however, the property interest may be involuntarily relinquished. In this regard, "[a] constructive discharge occurs when an employer deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation." *Manning v City of Hazel Park*, 202 Mich App 685, 697; 509 NW2d 874 (1993). "[C]onstructive discharge is a defense against the argument that no suit should lie in a specific case because the plaintiff left the job voluntarily." *Vagts v Perry Drug Stores, Inc*, 204 Mich App 481, 487; 516 NW2d 102 (1994).[7]

Here, defendants do not dispute that plaintiff had a property interest in continued tenure. The issue is whether plaintiff was constructively discharged by defendants, such that defendants should be treated as having terminated her employment. See *Champion v Nationwide Sec, Inc*, 450 Mich 702, 710; 545 NW2d 596 (1996), overruled in part on other grounds by *Hamed v Wayne Co*, 490 Mich 1; 803 NW2d 237 (2011) ("[O]nce individuals establish their constructive discharge,

---

[5] Our Supreme Court has adopted the *Loudermill* standard for the issues involved in this case. See *Tomiak*, 426 Mich at 700.

[6] "Caselaw from . . . federal courts is not binding precedent but may be relied on for its persuasive value." *Haydaw v Farm Bureau Ins Co*, 332 Mich App 719, 726 n 5; 957 NW2d 858 (2020).

[7] At least one federal circuit has explained that there are "two types of 'involuntary resignation' that amount to termination: constructive discharge and coerced resignation." *Ulrey v Reichhart*, 941 F3d 255, 261 (CA 7, 2019). "Constructive discharge is akin to a hostile work environment claim and may occur when an employer makes employment so unbearable that an employee resigns." *Id*. (quotation marks and citations omitted). "Coerced resignation, on the other hand, is characterized by the presence of a Hobson's choice in which the employee must resign or suffer severe consequences, such as facing criminal charges." *Id*. (quotation marks and citation omitted). Michigan courts have not yet adopted this distinction, so we will refer to plaintiff's arguments solely as relating to constructive discharge.

they are treated as if their employer had actually fired them. . . . The decision to terminate in a constructive discharge case, therefore, is imputed to the employer.").

Michigan courts apparently have not yet outlined a multifactor test for determining whether an employee was constructively discharged. The federal district court in this case, when considering essentially the same procedural due-process argument that we consider today, identified the following factors for determining whether an employee was constructively discharged:

> (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a younger supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (7) offers of early retirement or continued employment on terms less favorable than the employee's former status. [*Kosch*, 662 F Supp 3d at 783, quoting *Logan v Denny's Inc*, 259 F3d 558, 569 (CA 6, 2001) (quotation marks and citation omitted).]

In our judgment, these *Logan* factors are better applied to cases involving, for example, race discrimination, in which the affected employee is persistently, unfairly, and negatively treated by the employer to the point of resignation. Indeed, *Logan* itself was a race-discrimination case under Title VII. See *Logan*, 259 F3d at 559. The *Logan* factors are not quite applicable here, as the matter before us involves an employee being confronted with alleged wrongdoing and resigning shortly thereafter. Thus, we must consider the question of whether plaintiff involuntarily resigned. See footnote seven, *supra*.

"Employee resignations and retirements are presumed to be voluntary." *Leheny v City of Pittsburgh*, 183 F3d 220, 227 (CA 3, 1999). "There appear to be two circumstances in which an employee's resignation or retirement will be deemed involuntary for due process purposes: (1) when the employer forces the resignation or retirement by coercion or duress, or (2) when the employer obtains the resignation or retirement by deceiving or misrepresenting a material fact to the employee." *Id*. at 228. "Under the 'misrepresentation' theory, a resignation may be found involuntary if induced by an employee's reasonable reliance upon an employer's misrepresentation of a material fact concerning the resignation." *Stone v Univ of Maryland Med Sys Corp*, 855 F2d 167, 174 (CA 4, 1988). "A misrepresentation is material if it concerns either the consequences of the resignation or the alternative to resignation." *Id*. (citations omitted).

With regard to the "coercion" theory, in *Rhoads v Bd of Ed of Mad River Local Sch Dist*, 103 Fed App'x 888 (CA 6, 2004), the plaintiff resigned her position as a bus driver for the defendant school district after failing a random drug test. *Id*. at 889. The plaintiff subsequently sued the defendant, arguing, in relevant part, that she had a property interest in continued employment and that the defendant violated her procedural due-process rights. *Id*. at 894. In addressing her claim, the Sixth Circuit set forth the following principles and multifactor test for determining whether she was constructively discharged:

> On appeal, Rhoads argues that she did not resign voluntarily. A public employee with a property interest in continued employment is deprived of that interest by her employer if the employer constructively discharges her by forcing

her to resign involuntarily. However, if a plaintiff resigns of her own free will, even as a result of the defendant's actions, then she voluntarily relinquishes her property interest in continued employment, and the defendant cannot be found to have deprived her of that interest without due process of law.

In general, employee resignations are presumed to be voluntary. An employee may rebut this presumption by producing evidence indicating that the resignation was involuntarily procured. Whether an employee's resignation was involuntary depends upon whether an objectively reasonable person would, under the totality of the circumstances, feel compelled to resign if he were in the employee's position. Relevant to this inquiry are (1) whether the employee was given an alternative to resignation, (2) whether the employee understood the nature of the choice she was given, (3) whether the employee was given a reasonable time in which to choose, and (4) whether the employee could select the effective date of resignation. The mere fact that an employee is forced to choose between resignation and termination does not alone establish that a subsequent choice to resign is involuntary, provided that the employer had good cause to believe there were grounds for termination. On the other hand, an employee resigns involuntarily if, after being given a choice between resignation and termination, she is not granted sufficient time and opportunity to deliberate about the choice. [*Id*. at 894-895 (cleaned up).]

The Court then concluded that the plaintiff did not show that she was forced to resign, reasoning as follows:

In Rhoads's case, the District presented her with a choice between termination—which was required under the District's policy because she had tested positive for marijuana—and resignation. Indeed, she obtained the option of resignation at her own request, suggesting that the ultimate decision to resign was preferable to her and of her own choosing. Second, the fact that she requested the option of resignation in lieu of termination also indicates that she understood the choice presented to her. Third, according to Rhoads's account, DiNino gave her between approximately 10:00 a.m. and 5:00 p.m. on April 15 to choose between the two options. Although this time frame was perhaps not as lengthy as Rhoads would have liked, she was not pressured to make her decision immediately or otherwise coerced into making an uninformed judgment. Finally, it is unclear whether Rhoads had discretion to select the effective date of her resignation. It could certainly be concluded that she did not, considering that she was given until 5:00 p.m. on April 15 to resign and that the resignation submitted that day states that it was effective immediately. [*Id*. at 895.]

Applying the principles outlined in *Rhoads* here, we conclude that plaintiff's resignation was voluntary.[8] As to the misrepresentation theory, plaintiff argues that defendants lied to her by indicating that she violated FERPA. We acknowledge that such a misrepresentation, regardless of whether it was an intentional lie or an innocent misunderstanding, might suggest that her resignation was involuntary, thus establishing a violation of procedural due process. See *Spreen v Brey*, 961 F2d 109, 113 (CA 7, 1992) ("The misleading information can be negligently or even innocently provided; if the employee materially relies on the misinformation to his detriment, his retirement is considered involuntary.") (quotation marks and citation omitted). However, here, the record does not show that defendants informed plaintiff that she violated FERPA. Rather, the record shows that defendants merely were investigating a possible violation of FERPA. In particular, Berck testified that she told plaintiff during the preliminary investigation that she "was concerned there may have been" a violation of FERPA. Additionally, plaintiff testified as follows:

> Q. In fact, in this particular circumstance, you never made it to any disciplinary proceeding; correct?

> A. No. I was given nothing in writing. I was given . . . other than the video itself, the possibility of FERPA violation, I was given very little other information or there was nothing in writing. There was no charges. There was nothing prior to being suspended.

Therefore, after reviewing the record, we conclude that plaintiff did not show that her resignation was involuntary because it was induced by reliance on a misrepresentation by defendants that there was a FERPA violation. See *Stone*, 855 F2d at 174.[9]

As to the coercion, plaintiff argues that she was denied counsel during the meeting with Berck, that use of the recording by defendants violated the state eavesdropping statute, and that she was threatened with the inability to obtain comparable work in the future and maximize her pension. We disagree with plaintiff. As to the alleged deprivation of counsel, the federal district court explained, "[n]othing prevented [plaintiff] from consulting with anyone she wished—counsel or otherwise—before making that decision [to resign]. So, any policy TCAPS had or did not have about the presence of counsel is largely beside the point when it comes to assessing whether Ms. Kosch made a voluntary decision she later came to regret, or whether defendants

---

[8] We acknowledge that the parties have not framed this issue as we do. However, plaintiff's arguments, and defendants' response thereto, concern whether plaintiff's resignation was involuntary (1) because she was misled by defendants or (2) because she was coerced by defendants, or both. To address this, we must do so within the proper legal context and framework.

[9] Plaintiff also contends that her resignation was involuntary because she was assigned a biased union representative. Arguably, this fact, if true, might tend to show that she was misled into resigning because she incorrectly assumed that her union representative at the meeting was unbiased. Regardless, plaintiff has not shown that she relied upon her union representative when deciding to resign. Nor, is there any indication of bias in the record.

forced her into it." *Kosch*, 662 F Supp 3d at 784. Thus, the fact that plaintiff was not represented by counsel during the meeting does not establish that she was coerced into resigning.

With regard to the use of the recording, MCL 750.539c provides that "[a]ny person who is present or who is not present during a private conversation and who wilfully uses any device to eavesdrop upon the conversation without the consent of all parties thereto . . . is guilty of a felony[.]" In addition, MCL 750.539e provides that "[a]ny person who uses or divulges any information which he knows or reasonably should know was obtained in violation of . . . [MCL 750.539c] . . . is guilty of a felony[.]" Assuming for the sake of argument that defendants' consideration of the recorded conversation constituted "use" under MCL 750.539e, we are unpersuaded that the recording itself was obtained in violation of MCL 750.539c. As our Supreme Court explained, "the question whether [the] plaintiff's conversation was private depends on whether she intended and reasonably expected it to be private at the time and under the circumstances involved." *Dickerson v Raphael*, 461 Mich 851, 851 (1999). Here, plaintiff had an active microphone and was broadcasting her comments to a virtual classroom that was open to her students when a student, L.H., began listening and recording. Under these circumstances, plaintiff's conversation cannot reasonably be considered private, regardless of her subjective understanding and hope at the time.

Finally, as to plaintiff's contention that she was threatened by Berck's statement that plaintiff would be unable to obtain comparable work in the future, and maximize her pension, if she did not resign, the mere fact that she faced a difficult choice regarding whether to resign does not render her choice involuntary. See *Rhoads*, 103 Fed App'x at 894-895. The record shows that plaintiff was presented with the option to either resign or proceed against possible tenure charges—if plaintiff decided to proceed and ultimately was terminated, it would be more difficult for her to obtain other employment and pension advancement in the future. There is no suggestion in the record that these options were inaccurate at the time they were discussed, that plaintiff was not given sufficient time to choose between these two options, or that plaintiff was pressured into choosing resignation.

In the end, none of the arguments presented by plaintiff show that her resignation was involuntary, under either a misrepresentation theory or a coercion theory. Moreover, our analysis of the four *Rhoads* factors leads to the conclusion that her resignation was voluntary. See *id*. First, plaintiff was given an alternative to resignation, namely, proceeding against possible tenure charges. Second, as explained, there is nothing to suggest that plaintiff did not accurately understand the ramifications of resigning. Third, plaintiff was not required to decide whether to resign or proceed under any particular time frame. In other words, for example, plaintiff was not given a matter of minutes, hours, or even days to decide whether to resign. Fourth, there is nothing to suggest that plaintiff could not select the effective date of her resignation. Indeed, the resignation letter indicates that its immediate effectiveness was the result of plaintiff's own decision.

Accordingly, for these reasons, we conclude that there is no genuine issue of material fact as to whether defendants deprived plaintiff of a property interest contrary to due process.

IV. EXHAUSTION OF REMEDIES

-12-

Plaintiff argues that her claim to reinstate her employment is not precluded despite her failure to exhaust administrative remedies. In light of our conclusion above, we need not reach this question. In any event, we disagree with plaintiff and we explain our reasons for doing so below.

"Premised on the doctrine of separation of powers, it is well settled that where an administrative grievance procedure is provided, exhaustion of that remedy is required before the circuit court can review the case." *Mich Supervisors Union OPEIU Local 512 v Dep't of Civil Serv*, 209 Mich App 573, 576-577; 531 NW2d 790 (1995) (footnote omitted). "Yet, a plaintiff may seek judicial review of a nonfinal agency decision when a final agency decision or order would not provide an adequate remedy, or if pursuing the administrative remedy would be an exercise in futility and nothing more than a formal step on the way to the courthouse." *Id*. at 577 (quotation marks and citations omitted). "[A] constructively discharged employee, like an expressly discharged employee, must exhaust his administrative remedies." *Mollett v City of Taylor*, 197 Mich App 328, 345; 494 NW2d 832 (1992).

Relatedly, a party generally must exhaust the grievance process set forth in a CBA before filing suit in court. See *Am Federation of State, Co, and Mun Employees v Bd of Ed of Sch Dist of City of Highland Park*, 457 Mich 74, 80-81; 577 NW2d 79 (1998) (opinion by CAVANAGH, J.). "Where internal union appeals procedures can result in either complete relief to an aggrieved employee or reactivation of his grievance, exhaustion would advance the national labor policy of encouraging private resolution of contractual labor disputes. In such cases, the internal union procedures are capable of fully resolving meritorious claims short of the judicial forum." *Id*. at 86-87 (quotation marks and citation omitted).

In this case, plaintiff does not dispute that she failed to exhaust her administrative remedies, whether provided by law or by the CBA, or both.[10] Instead, plaintiff argues that she was not required to exhaust her administrative remedies because she could not expect to receive a fair hearing on her claim, as the union was biased against her. Plaintiff observes that the union representative assigned on her behalf was pursuing a claim against her in an unrelated matter, and she was not a dues-paying member of the union. Plaintiff also asserts that the administrative remedies were inadequate because "[t]here is no ability to get punitive damages for the various

---

[10] The TTA provides administrative procedures for challenging a dismissal. See, e.g., MCL 38.102. However, plaintiff frames this issue as involving her administrative remedies under the CBA, i.e., the CBA grievance process. Additionally, the federal district court in this case similarly framed this issue as involving the CBA grievance process. See *Kosch*, 662 F Supp 3d at 787. In this regard, the "Master Agreement" CBA between the Traverse City Education Association, MEA/NEA, and TCAPS provides a four-level grievance process for a teacher who alleges a violation of the CBA. Notably, however, the CBA provides that the arbitrator in the fourth level of the process has "no power to rule on . . . [t]he termination of services of or failure to reemploy any teacher." Moreover, we note that the CBA provided to the trial court and this Court by defendants was effective September 1, 2021 to August 31, 2024. As the events in question occurred in 2020, the CBA in effect at that time would have been more helpful for our review rather than the subsequent CBA.

deprivations of civil rights, violation of her privacy via the use of a felonious recording, and the refusal to be allowed legal representation."

Initially, we note that plaintiff's argument that she was not required to exhaust the grievance process set forth by the CBA because the union was biased against her is somewhat inapposite. Ordinarily, in such a case, a party would maintain a claim in court against the union for a breach of the duty of fair representation. See *Murad v Professional & Admin Union Local 19179*, 239 Mich App 538, 543; 609 NW2d 588 (2000). Plaintiff has not done so here. Moreover, as noted in footnote 10, *supra*, the current CBA implies that the contractual grievance process is not the proper method for challenging a dismissal. Nonetheless, given the manner in which the parties and the federal district court have framed this issue, we will proceed under the assumption that the issue before us is whether plaintiff was required to exhaust her administrative remedies under the CBA, i.e., the CBA grievance process.

We conclude that plaintiff was required to exhaust her administrative remedies under the CBA. In *Clayton v Int'l Union, UAW*, 451 US 679, 689; 101 S Ct 2088; 68 L Ed 2d 538 (1981), the United States Supreme Court set forth the following three-part test for determining whether to require exhaustion of union procedures:

[C]ourts have discretion to decide whether to require exhaustion of internal union procedures. In exercising this discretion, at least three factors should be relevant: first, whether union officials are so hostile to the employee that he could not hope to obtain a fair hearing on his claim; second, whether the internal union appeals procedures would be inadequate either to reactivate the employee's grievance or to award him the full relief he seeks under § 301 [of the Labor Management Relations Act, 29 USC 185(a)]; and third, whether exhaustion of internal procedures would unreasonably delay the employee's opportunity to obtain a judicial hearing on the merits of his claim. If any of these factors are found to exist, the court may properly excuse the employee's failure to exhaust.

While *Clayton* concerned federal labor law, in *Murad*, this Court adopted the *Clayton* test for the purposes of state labor law. See *Murad*, 239 Mich App at 544-545.

All three *Clayton* factors weigh in favor of a conclusion that plaintiff was required to exhaust her administrative remedies under the CBA. First, the union representative testified that she would represent all teachers covered by the CBA, regardless of whether the teacher was a member of the union. This testimony was uncontested. Indeed, our Supreme Court recently explained that a union is required to represent all covered employees in the grievance process, regardless of whether the employee is a member of the union, and that requiring a payment from a non-member in exchange for representation violates the duty of fair representation:

[W]e strike down the Union's pay-for-service fee policy as a violation of the duty of fair representation. The fee policy applies to only nonunion employees within the relevant bargaining unit, such as Renner, and deprives those nonunion employees of access to the grievance administration process that they are compelled to use pursuant to the collective bargaining agreement unless they pay the demanded fee. The Union also has not obligated itself to make an initial assessment

-14-

of the potential merit of a nonunion employee's grievance unless and until the required fee has been paid. Under such circumstances, the Union's fee policy violates the duty of fair representation. [*Technical, Professional & Officeworks Assoc of Mich v Renner*, __ Mich __; __ NW3d __ (2024) (Docket No. 162601); slip op at 36.]

Thus, under *Renner*, the union here was required to represent plaintiff in the grievance process. There is no basis for concluding that it failed to do so, contrary to its duty of fair representation. Moreover, while plaintiff argues that the union representative was biased against her, the union representative indicated that the alleged conflict had only existed for about a day, and at the initial stage of the investigation, any conflict was insubstantial as the decision whether to file a union grievance on Battle's behalf had yet to be made. We find no reason to disagree with this deposition testimony, particularly in light of the fact that the union representative recognized that if proceedings against plaintiff continued, a real conflict would arise, thus requiring her to step aside.

Second, the parties do not contest that the grievance process would be sufficient to award plaintiff the return of her employment and associated tenure and benefits.[11] While plaintiff argues that the grievance process was insufficient to award her other damages to which she was entitled, the damages identified by plaintiff—specifically, damages for "deprivations of civil rights, violation of her privacy via the use of a felonious recording, and the refusal to be allowed legal representation," all arise from the allegedly wrongful discharge itself. In other words, without the allegedly wrongful discharge, plaintiff would not have suffered any harm from those she alleges occurred. Thus, the underlying question before the union, and before the courts, is whether plaintiff was wrongfully discharged. As we explained in *L & L Wine and Liquor Corp v Liquor Control Comm'n*, 274 Mich App 354; 733 NW2d 107 (2007):

> A remedy is not "inadequate" so as to authorize judicial intervention before exhaustion of the remedy merely because it is attended with delay, expense, annoyance, or even some hardship. There must be something in the nature of the action or proceeding that indicates to the court that it will not be able to protect the rights of the litigants or afford them adequate redress otherwise than through the exercise of this extraordinary jurisdiction. [*Id*. at 360 (quotation marks and citation omitted).]

Because the grievance process presumably would afford plaintiff "adequate redress," exhaustion of remedies cannot be excused on this basis.

---

[11] While we are uncertain about the accuracy of that assumption, see footnote 10, *supra*, we note that plaintiff only argues that the grievance process was inadequate because it would not allow her monetary relief for "deprivations of civil rights, violation of her privacy via the use of a felonious recording, and the refusal to be allowed legal representation." By implication, plaintiff does not dispute that the grievance process was adequate to restore her employment and associated tenure and benefits.

Third, exhaustion of the grievance process would not unreasonably delay plaintiff an opportunity to have her issues judicially adjudicated. Indeed, if plaintiff had pursued the grievance process with success in 2020, this case likely would not be before us in 2024. In other words, failure to exhaust administrative remedies in this case may have had the impact of delaying resolution of the case, not expediting it.

For these reasons, we conclude that plaintiff was required to exhaust her administrative remedies and, because she did not, her claims to reinstate her employment must be dismissed for that alternate reason.

## V. QUALIFIED IMMUNITY AND INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

Finally, plaintiff argues that the trial court erred by dismissing her claim for intentional infliction of emotional distress against Berck. According to plaintiff, Berck violated a "clearly established right" and thus is not entitled to qualified immunity. Plaintiff also argues that she established a claim for intentional infliction of emotional distress against Berck. Specifically, plaintiff contends that Berck denied her the assistance of counsel at the meeting, violated the state eavesdropping statute, misrepresented the severity of plaintiff's recorded comments, and selected a biased union representative on behalf of plaintiff. We disagree.[12]

At common law, governmental employees had immunity from intentional torts in certain cases. *Odom v Wayne Co*, 482 Mich 459, 472; 760 NW2d 217 (2008). The Governmental Tort Liability Act, MCL 691.1401 *et seq*., retained the common law that existed in this regard as of July 7, 1986. *Id*. at 481. Our Supreme Court set forth the following test for determining whether a governmental employee has immunity from an intentional tort:

> If the plaintiff pleaded an intentional tort, determine whether the defendant established that he is entitled to individual governmental immunity . . . by showing the following:
>
> (a) The acts were undertaken during the course of employment and the employee was acting, or reasonably believed that he was acting, within the scope of his authority,
>
> (b) the acts were undertaken in good faith, or were not undertaken with malice, and
>
> (c) the acts were discretionary, as opposed to ministerial. [*Id*. at 480.]

---

[12] On appeal, both parties misstate the relevant law with respect to the issue of governmental immunity. Plaintiff refers to federal law regarding qualified immunity, while defendants refer to state law regarding gross negligence under MCL 691.1407. Both sides are incorrect. The question here is whether Berck, as a governmental employee, is immune from a claim for an intentional tort under the state common law.

In this case, Berck initiated the investigation into plaintiff's recorded conversation in the course of Berck's employment as TCAPS human-resources director, a position in which she presumably is responsible for maintaining a professional work environment in compliance with federal law. Thus, Berck's actions satisfy the first element of the *Odom* test.

Moreover, as to the second element, there is nothing in the record suggesting that Berck did not act in good faith. Berck testified in her deposition that her "concern was when [plaintiff] told her husband that M.B. was a culprit in some kind of situation." It certainly was reasonable for Berck to initiate an investigation into whether this communication was improper.[13] In addition, while Berck denied plaintiff's request for an attorney to be present at the meeting despite the fact that she apparently had some flexibility on the matter, Berck explained that attorneys ordinarily were allowed "at the point at which discipline is being issued." And, after reviewing the record, we agree with the federal district court that "[t]here is good reason to doubt the claim that TCAPS violated any policy in deciding to conduct the pre-deprivation meeting without legal counsel present, or with only union representation present." *Kosch*, 662 F Supp 3d at 784 n 8.[14] Further, while plaintiff briefly testified that Berck told her that she "would be at risk of losing [her] pension" if she did not resign, plaintiff subsequently clarified that her concern was not with losing her pension but, rather, with "hitting the 30-year mark." Thus, it appears that Berck did not mislead plaintiff with regard to the availability of her pension. Lastly, as we have explained, the union representation at the meeting was proper, given that the investigation was in the initial stage. Accordingly, for these reasons, we conclude that Berck acted in good faith.

Finally, with regard to the third *Odom* element, Berck had discretion relating to the investigative procedure, and none of the conduct plaintiff challenges was ministerial. Therefore, Berck is entitled to governmental immunity under *Odom*.

Alternatively, even if Berck is not entitled to governmental immunity, her conduct still did not constitute intentional infliction of emotional distress. "To establish a claim of intentional infliction of emotional distress, a plaintiff must prove the following elements: (1) extreme and outrageous conduct, (2) intent or recklessness, (3) causation, and (4) severe emotional distress." *Hayley v Allstate Ins Co*, 262 Mich App 571, 577; 686 NW2d 273 (2004) (quotation marks and citation omitted). "The conduct complained of must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community." *Id*. (quotation marks and citation omitted). "It is for the trial court to initially determine whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery." *Id*.

---

[13] As previously explained, Berck did not affirmatively inform plaintiff that she violated FERPA. Instead, Berck informed plaintiff that she was investigating whether plaintiff violated FERPA.

[14] We also agree with the federal district court that "there is nothing so well-established about whether taping a 'hot mic' moment where both the original taper (L.H.) and the speaker were lawfully present in the same virtual environment violates the Michigan eavesdropping statute that the Court is prepared to characterize the conduct as felonious." *Kosch*, 662 F Supp 3d at 785.

-17-

Berck's conduct in this case did not exceed "all possible bounds of decency." It would have been a dereliction of duty for an individual in her position to fail to investigate the recorded conversation in light of the fact that it was known to the school administration and was spreading through the TCAPS community. Further, Berck contacted a union representative to represent plaintiff during the initial meeting about the matter. As previously noted, the record does not show that Berck misled plaintiff or pressured her to resign without an opportunity for reflection. Under these circumstances, while the investigation perhaps might have been handled somewhat differently in minor respects, Berck did not act so outrageously so as to constitute the tort of intentional infliction of emotional distress.

## VI. CONCLUSION

The trial court did not err by granting summary disposition in favor of defendants. Therefore, we affirm.

/s/ Michael J. Riordan
/s/ Michelle M. Rick
/s/ Noah P. Hood